# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 9, 2013       Decided January 14, 2014

No. 11-1355

VERIZON,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

INDEPENDENT TELEPHONE & TELECOMMUNICATIONS
ALLIANCE, ET AL.,
INTERVENORS

———

Consolidated with 11-1356

———

On Petition For Review and Notice of Appeal
of an Order of the Federal Communications Commission

———

*Helgi C. Walker* argued the cause for appellant/petitioner Verizon. With her on the briefs were *Eve Klindera Reed*, *William S. Consovoy*, *Brett A. Shumate*, *Walter E. Dellinger*, *Anton Metlitsky*, *Samir C. Jain*, *Carl W. Northrup*, *Michael Lazarus*, *Andrew Morentz*, *Michael E. Glover*, *William H. Johnson*, *Stephen B. Kinnaird*, and *Mark A. Stachiw*. *John T. Scott III* and *Edward Shakin* entered appearances.

*Stephen B. Kinnaird, Carl W. Northrup*, *Michael Lazarus*, *Andrew Morentz*, and *Mark A. Stachiw* were on the briefs for appellants/petitioners MetroPCS Communications, Inc., et al.

*John P. Elwood*, *Sam Kazman*, *Randolph May*, and *Ilya Shapiro* were on the brief for *amici curiae* The Competitive Enterprise Institute, et al. in support of appellant/petitioner.

*Russell P. Hanser*, *Bryan N. Tramont*, and *Quentin Riegel* were on the brief for *amicus curiae* National Association of Manufacturers in support of appellant/petitioner.

*Kenneth T. Cuccinelli*, *II*, Attorney General, Office of the Attorney General for the Commonwealth of Virginia, *E. Duncan Getchell*, *Jr.*, Solicitor General, and *Wesley G. Russell*, *Jr.*, Deputy Attorney General, were on the brief for *amici curiae* The Commonwealth of Virginia, et al. in support of appellant/petitioner.

*Sean A. Lev*, General Counsel, Federal Communications Commission, argued the cause for appellee/respondent. With him on the briefs were *Catherine G. O'Sullivan* and *Nickolai G. Levin*, Attorneys, U.S. Department of Justice, *Peter Karanjia*, Deputy General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Associate General Counsel, and *Joel Marcus* and *Matthew J. Dunne*, Counsel. *Robert J. Wiggers*, Attorney, U.S. Department of Justice, *R. Craig Lawrence*, Assistant U.S. Attorney, and *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered appearances.

*Pantelis Michalopoulos* argued the cause for intervenors. With him on the brief were *Stephanie A. Roy*, *Andrew W. Guhr*, *Henry Goldberg*, *David C. Bergmann*, *Kurt Matthew Rogers*, and *Brendan Daniel Kasper*. *Markham C. Erickson*, *Jeffrey J.*

*Binder*, *Harold J. Feld* and *James B. Ramsay* entered appearances.

*Sean H. Donahue* and *David T. Goldberg* were on the brief for *amici curiae* Reed Hundt, et al. in support of appellee/respondent.

*E. Joshua Rosenkranz*, *Gabriel M. Ramsey*, *Thomas J. Gray*, and *Christina Von der Ahe* were on the brief for *amici curiae* Venture Capital Investors in support of appellee/respondent.

*Andrew Jay Schwartzman* was on the brief for *amicus curiae* Tim Wu in support of appellee/respondent.

*John Blevins* was on the brief for *amici curiae* Internet Engineers and Technologists in support of appellee/respondent.

*Kevin S. Bankston* and *Emma J. Llansó* were on the brief for *amici curiae* The Center for Democracy and Technology, et al. in support of appellee/respondent.

Before: ROGERS and TATEL, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* SILBERMAN.

TATEL, *Circuit Judge*: For the second time in four years, we are confronted with a Federal Communications Commission effort to compel broadband providers to treat all Internet traffic the same regardless of source—or to require, as

it is popularly known, "net neutrality." In *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010), we held that the Commission had failed to cite any statutory authority that would justify its order compelling a broadband provider to adhere to open network management practices. After *Comcast*, the Commission issued the order challenged here—*In re Preserving the Open Internet*, 25 F.C.C.R. 17905 (2010) ("the *Open Internet Order*")—which imposes disclosure, anti-blocking, and anti-discrimination requirements on broadband providers. As we explain in this opinion, the Commission has established that section 706 of the Telecommunications Act of 1996 vests it with affirmative authority to enact measures encouraging the deployment of broadband infrastructure. The Commission, we further hold, has reasonably interpreted section 706 to empower it to promulgate rules governing broadband providers' treatment of Internet traffic, and its justification for the specific rules at issue here—that they will preserve and facilitate the "virtuous circle" of innovation that has driven the explosive growth of the Internet—is reasonable and supported by substantial evidence. That said, even though the Commission has general authority to regulate in this arena, it may not impose requirements that contravene express statutory mandates. Given that the Commission has chosen to classify broadband providers in a manner that exempts them from treatment as common carriers, the Communications Act expressly prohibits the Commission from nonetheless regulating them as such. Because the Commission has failed to establish that the anti-discrimination and anti-blocking rules do not impose *per se* common carrier obligations, we vacate those portions of the *Open Internet Order*.

**I.**

Understanding this case requires an understanding of the Internet, the Internet marketplace, and the history of the Commission's regulation of that marketplace.

Four major participants in the Internet marketplace are relevant to the issues before us: backbone networks, broadband providers, edge providers, and end users. Backbone networks are interconnected, long-haul fiber-optic links and high-speed routers capable of transmitting vast amounts of data. *See In re Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, 20 F.C.C.R. 18433, 18493 ¶ 110 (2005). Internet users generally connect to these networks—and, ultimately, to one another—through local access providers like petitioner Verizon, who operate the "last-mile" transmission lines. *See Open Internet Order*, 25 F.C.C.R. at 17908, 17915 ¶¶ 7, 20. In the Internet's early days, most users connected to the Internet through dial-up connections over local telephone lines. *See In re Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 F.C.C.R. 4798, 4802–03 ¶ 9 (2002) ("*Cable Broadband Order*"). Today, access is generally furnished through "broadband," i.e., high-speed communications technologies, such as cable modem service. *See In re Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 25 F.C.C.R. 9556, 9557, 9558–59 ¶¶ 1, 4 (2010) ("*Sixth Broadband Deployment Report*"); 47 U.S.C. § 1302(d)(1). Edge providers are those who, like Amazon or Google, provide content, services, and applications over the Internet, while end users are those who consume edge providers' content, services, and applications. *See Open Internet Order*, 25 F.C.C.R. at 17910 ¶ 13. To pull the whole picture together with a slightly oversimplified

example: when an edge provider such as YouTube transmits some sort of content—say, a video of a cat—to an end user, that content is broken down into packets of information, which are carried by the edge provider's local access provider to the backbone network, which transmits these packets to the end user's local access provider, which, in turn, transmits the information to the end user, who then views and hopefully enjoys the cat.

These categories of entities are not necessarily mutually exclusive. For example, end users may often act as edge providers by creating and sharing content that is consumed by other end users, for instance by posting photos on Facebook. Similarly, broadband providers may offer content, applications, and services that compete with those furnished by edge providers. *See Open Internet Order*, 25 F.C.C.R. at 17915 ¶ 20.

Proponents of net neutrality—or, to use the Commission's preferred term, "Internet openness"—worry about the relationship between broadband providers and edge providers. They fear that broadband providers might prevent their end-user subscribers from accessing certain edge providers altogether, or might degrade the quality of their end-user subscribers' access to certain edge providers, either as a means of favoring their own competing content or services or to enable them to collect fees from certain edge providers. Thus, for example, a broadband provider like Comcast might limit its end-user subscribers' ability to access the *New York Times* website if it wanted to spike traffic to its own news website, or it might degrade the quality of the connection to a search website like Bing if a competitor like Google paid for prioritized access.

Since the advent of the Internet, the Commission has confronted the questions of whether and how it should regulate this communications network, which, generally speaking, falls comfortably within the Commission's jurisdiction over "all interstate and foreign communications by wire or radio." 47 U.S.C. § 152(a). One of the Commission's early efforts occurred in 1980, when it adopted what is known as the *Computer II* regime. The *Computer II* rules drew a line between "basic" services, which were subject to regulation under Title II of the Communications Act of 1934 as common carrier services, *see* 47 U.S.C. §§ 201 et seq., and "enhanced" services, which were not. *See In re Amendment of Section 64.702 of the Commission's Rules and Regulations*, 77 F.C.C.2d 384, 387 ¶¶ 5–7 (1980) ("*Second Computer Inquiry*"). What distinguished "enhanced" services from "basic" services was the extent to which they involved the processing of information rather than simply its transmission. *Id.* at 420–21 ¶¶ 96–97. For example, the Commission characterized telephone service as a "basic" service, *see id.* at 419 ¶ 94, because it involved a "pure" transmission that was "virtually transparent in terms of its interaction with customer supplied information," *id.* at 420 ¶ 96. Services that involved "computer processing applications . . . used to act on the content, code, protocol, and other aspects of the subscriber's information"—a definition that encompassed the services needed to connect an end user to the Internet—constituted enhanced services. *Id.* at 420 ¶ 97.

By virtue of their designation as common carriers, providers of basic services were subject to the duties that apply to such entities, including that they "furnish . . . communication service upon reasonable request," 47 U.S.C. § 201(a), engage in no "unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services," *id.* § 202(a), and charge "just and reasonable" rates, *id.*

§ 201(b). Although the Commission applied no such restrictions to purveyors of enhanced services, it imposed limitations on certain entities, like AT&T, which owned the transmission facilities over which enhanced services would be provided. *Second Computer Inquiry*, 77 F.C.C.2d at 473–74 ¶¶ 228–29. These restrictions included, most significantly, requirements that such entities offer enhanced services only through a completely separate corporate entity and that they offer their transmissions facilities to other enhanced service providers on a common carrier basis. *Id.*

For more than twenty years, the Commission applied some form of the *Computer II* regime to Internet services offered over telephone lines, then the predominant way in which most end users connected to the Internet. *See, e.g.*, *In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 17 F.C.C.R. 3019, 3037–40 ¶¶ 36–42 (2002). Telephone companies that provided the actual wireline facilities over which information was transmitted were limited in the manner in which they could provide the enhanced services necessary to permit end users to access the Internet. *Id.* at 3040 ¶ 42. They were also required to permit third-party Internet Service Providers (ISPs), such as America Online, to access their wireline transmission facilities on a common carrier basis. *Id.*

It was against this background that Congress passed the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. Tracking the *Computer II* distinction between basic and enhanced services, the Act defines two categories of entities: telecommunications carriers, which provide the equivalent of basic services, and information-service providers, which provide the equivalent of enhanced services. 47 U.S.C. § 153(24), (50), (51), (53); *see National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545

U.S. 967, 976–77 (2005). The Act subjects telecommunications carriers, but not information-service providers, to Title II common carrier regulation. 47 U.S.C. § 153(53); *Brand X*, 545 U.S. at 975–76.

Pursuant to the Act, and paralleling its prior practice under the *Computer II* regime, the Commission then classified Digital Subscriber Line (DSL) services—broadband Internet service furnished over telephone lines—as "telecommunications services." *See In re Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 F.C.C.R. 24012, 24014, 24029–30 ¶¶ 3, 35–36 (1998) ("*Advanced Services Order*"). DSL services, the Commission concluded, involved pure transmission technologies, and so were subject to Title II regulation. *Id.* at 24030–31 ¶ 35. A DSL provider could exempt its Internet access services, but not its transmission facilities themselves, from Title II common carrier restrictions only by operating them through a separate affiliate (i.e., a quasi-independent ISP). *Id.* at 24018 ¶ 13.

Four years later, however, the Commission took a different approach when determining how to regulate broadband service provided by cable companies. Instead of viewing cable broadband providers' transmission and processing of information as distinct services, the Commission determined that cable broadband providers—even those that own and operate the underlying last-mile transmission facilities—provide a "single, integrated information service." *Cable Broadband Order*, 17 F.C.C.R. at 4824 ¶ 41. Because cable broadband providers were thus not telecommunications carriers at all, they were entirely exempt from Title II regulation. *Id.* at 4802 ¶ 7.

In *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005), the Supreme Court upheld the Commission's classification of cable broadband providers. The Court concluded that the Commission's ruling represented a reasonable interpretation of the 1996 Telecommunications Act's ambiguous provision defining telecommunications service, *see id.* at 991–92, and that the Commission's determination was entitled to deference notwithstanding its apparent inconsistency with the agency's prior interpretation of that statute, *see id.* at 981, 1000–01.

Following *Brand X*, the Commission classified other types of broadband providers, such as DSL and wireless, which includes those offering broadband Internet service for cellular telephones, as information service providers exempt from Title II's common carrier requirements. *See In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14853, 14862 ¶ 12 (2005) ("*2005 Wireline Broadband Order*"); *In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, 22 F.C.C.R. 5901, 5901–02 ¶ 1 (2007) ("*Wireless Broadband Order*"); *In re United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service*, 21 F.C.C.R. 13281, 13281 ¶ 1 (2006). Despite calls to revisit these classification orders, *see, e.g.*, *Open Internet Order*, 25 F.C.C.R. at 18046 (concurring statement of Commissioner Copps), the Commission has yet to overrule them.

But even as the Commission exempted broadband providers from Title II common carrier obligations, it left open the possibility that it would nonetheless regulate these entities. In the *Cable Broadband Order*, for example, the Commission sought comment on whether and to what extent it should utilize

the powers granted it under Title I of the Communications Act to impose restrictions on cable broadband providers. *Cable Broadband Order*, 17 F.C.C.R. at 4842 ¶ 77. Subsequently, in conjunction with the *2005 Wireline Broadband Order*, the Commission issued a Policy Statement in which it signaled its intention to "preserve and promote the open and interconnected nature of the public Internet." *In re Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 F.C.C.R. 14986, 14988 ¶ 4 (2005). The Commission announced that should it "see evidence that providers of telecommunications for Internet access or IP-enabled services are violating these principles," it would "not hesitate to take action to address that conduct." *2005 Wireline Broadband Order*, 20 F.C.C.R. at 14904 ¶ 96.

The Commission did just that when, two years later, several subscribers to Comcast's cable broadband service complained that the company had interfered with their use of certain peer-to-peer networking applications. *See In re Formal Complaint of Free Press and Public Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer Applications*, 23 F.C.C.R. 13028 (2008) ("*Comcast Order*"). Finding that Comcast's impairment of these applications had "contravene[d] . . . federal policy," *id.* at 13052 ¶ 43, the Commission ordered the company to adhere to a new approach for managing bandwidth demand and to disclose the details of that approach, *id.* at 13059–60 ¶ 54. The Commission justified its order as an exercise of what courts term its "ancillary jurisdiction," *see id.* at 13034–41 ¶¶ 14–22, a power that flows from the broad language of Communications Act section 4(i). *See* 47 U.S.C. § 154(i) ("The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."); *see generally American Library Ass'n v. FCC*, 406 F.3d 689, 700–03 (D.C. Cir. 2005).

We have held that the Commission may exercise such ancillary jurisdiction where two conditions are met: "(1) the Commission's general jurisdictional grant under Title I covers the regulated subject and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." *American Library Ass'n*, 406 F.3d at 691–92.

In *Comcast*, we vacated the Commission's order, holding that the agency failed to demonstrate that it possessed authority to regulate broadband providers' network management practices. 600 F.3d at 644. Specifically, we held that the Commission had identified no grant of statutory authority to which the *Comcast Order* was reasonably ancillary. *Id.* at 661. The Commission had principally invoked statutory provisions that, though setting forth congressional policy, delegated no actual regulatory authority. *Id.* at 651–58. These provisions, we concluded, were insufficient because permitting the agency to ground its exercise of ancillary jurisdiction in policy statements alone would contravene the "'axiomatic' principle that 'administrative agencies may [act] only pursuant to authority delegated to them by Congress.'" *Id.* at 654 (alteration in original) (quoting *American Library Ass'n*, 406 F.3d at 691). We went on to reject the Commission's invocation of a handful of other statutory provisions that, although they could "arguably be read to delegate regulatory authority," *id.* at 658, provided no support for the precise order at issue, *id*. at 658–61.

While the *Comcast* matter was pending, the Commission sought comment on a set of proposed rules that, with some modifications, eventually became the rules at issue here. *See In re Preserving the Open Internet*, 24 F.C.C.R. 13064 (2009). In support, it relied on the same theory of ancillary jurisdiction it had asserted in the *Comcast Order*. *See id.* at 13099 ¶¶ 83–85.

But after our decision in *Comcast* undermined that theory, the Commission sought comment on whether and to what extent it should reclassify broadband Internet services as telecommunications services. *See In re Framework for Broadband Internet Service*, 25 F.C.C.R. 7866, 7867 ¶ 2 (2010). Ultimately, however, rather than reclassifying broadband, the Commission adopted the *Open Internet Order* that Verizon challenges here. *See* 25 F.C.C.R. 17905.

The *Open Internet Order* establishes two sets of "prophylactic rules" designed to "incorporate longstanding openness principles that are generally in line with current practices." 25 F.C.C.R. at 17907 ¶ 4. One set of rules applies to "fixed" broadband providers—i.e., those furnishing residential broadband service and, more generally, Internet access to end users "primarily at fixed end points using stationary equipment." *Id.* at 17934 ¶ 49. The other set of requirements applies to "mobile" broadband providers—i.e., those "serv[ing] end users primarily using mobile stations," such as smart phones. *Id.*

The *Order* first imposes a transparency requirement on both fixed and mobile broadband providers. *Id.* at 17938 ¶ 56. They must "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of [their] broadband Internet access services." *Id.* at 17937 ¶ 54 (fixed providers); *see also id.* at 17959 ¶ 98 (mobile providers).

Second, the *Order* imposes anti-blocking requirements on both types of broadband providers. It prohibits fixed broadband providers from "block[ing] lawful content, applications, services, or non-harmful devices, subject to reasonable network management." *Id.* at 17942 ¶ 63. Similarly, the *Order* forbids mobile providers from "block[ing]

consumers from accessing lawful websites" and from "block[ing] applications that compete with the provider's voice or video telephony services, subject to reasonable network management." *Id.* at 17959 ¶ 99. The *Order* defines "reasonable network management" as practices designed to "ensur[e] network security and integrity," "address[] traffic that is unwanted by end users," "and reduc[e] or mitigat[e] the effects of congestion on the network." *Id.* at 17952 ¶ 82. The anti-blocking rules, the *Order* explains, not only prohibit broadband providers from preventing their end-user subscribers from accessing a particular edge provider altogether, but also prohibit them "from impairing or degrading particular content, applications, services, or non-harmful devices so as to render them effectively unusable." *Id.* at 17943 ¶ 66.

Third, the *Order* imposes an anti-discrimination requirement on fixed broadband providers only. Under this rule, such providers "shall not unreasonably discriminate in transmitting lawful network traffic over a consumer's broadband Internet access service. Reasonable network management shall not constitute unreasonable discrimination." *Id.* at 17944 ¶ 68. The Commission explained that "[u]se-agnostic discrimination"—that is, discrimination based not on the nature of the particular traffic involved, but rather, for example, on network management needs during periods of congestion—would generally comport with this requirement. *Id.* at 17945–46 ¶ 73. Although the Commission never expressly said that the rule forbids broadband providers from granting preferred status or services to edge providers who pay for such benefits, it warned that "as a general matter, it is unlikely that pay for priority would satisfy the 'no unreasonable discrimination' standard." *Id.* at 17947 ¶ 76. Declining to impose the same anti-discrimination requirement on mobile providers, the Commission explained that

differential treatment of such providers was warranted because the mobile broadband market was more competitive and more rapidly evolving than the fixed broadband market, network speeds and penetration were lower, and operational constraints were higher. *See id.* at 17956–57 ¶¶ 94–95.

As authority for the adoption of these rules, the Commission invoked a plethora of statutory provisions. *See id.* at 17966–81 ¶¶ 115–37. In particular, the Commission relied on section 706 of the 1996 Telecommunications Act, which directs it to encourage the deployment of broadband telecommunications capability. *See* 47 U.S.C. § 1302(a), (b). According to the Commission, the rules furthered this statutory mandate by preserving unhindered the "virtuous circle of innovation" that had long driven the growth of the Internet. *Open Internet Order*, 25 F.C.C.R. at 17910–11 ¶ 14; *see id.* at 17968, 17972 ¶¶ 117, 123. Internet openness, it reasoned, spurs investment and development by edge providers, which leads to increased end-user demand for broadband access, which leads to increased investment in broadband network infrastructure and technologies, which in turn leads to further innovation and development by edge providers. *Id.* at 17910–11 ¶ 14. If, the Commission continued, broadband providers were to disrupt this "virtuous circle" by "[r]estricting edge providers' ability to reach end users, and limiting end users' ability to choose which edge providers to patronize," they would "reduce the rate of innovation at the edge and, in turn, the likely rate of improvements to network infrastructure." *Id.* at 17911 ¶ 14.

Two members of the Commission dissented. As they saw it, the *Open Internet Order* rules not only exceeded the Commission's lawful authority, but would also stifle rather than encourage innovation. *See Open Internet Order*, 25 F.C.C.R. at 18049–81 (Dissenting Statement of Commissioner

McDowell); *id.* at 18084–98 (Dissenting Statement of Commissioner Baker).

Verizon filed a petition for review of the *Open Internet Order* pursuant to 47 U.S.C. § 402(a) as well as a notice of appeal pursuant to 47 U.S.C. § 402(b). Because "we plainly have jurisdiction by the one procedural route or the other," "we need not decide which is the more appropriate vehicle for our review." *Cellco Partnership v. FCC*, 700 F.3d 534, 541 (D.C. Cir. 2012) (internal quotation marks omitted).

Verizon challenges the *Open Internet Order* on several grounds, including that the Commission lacked affirmative statutory authority to promulgate the rules, that its decision to impose the rules was arbitrary and capricious, and that the rules contravene statutory provisions prohibiting the Commission from treating broadband providers as common carriers. In Part II, we consider Verizon's attacks on the Commission's affirmative statutory authority and its justification for imposing these rules. We consider the common carrier issue in Part III. Given our disposition of the latter issue, we have no need to address Verizon's additional contentions that the *Order* violates the First Amendment and constitutes an uncompensated taking.

Before beginning our analysis, we think it important to emphasize that although the question of net neutrality implicates serious policy questions, which have engaged lawmakers, regulators, businesses, and other members of the public for years, our inquiry here is relatively limited. "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) (internal quotation marks

omitted). Accordingly, our task as a reviewing court is not to assess the wisdom of the *Open Internet Order* regulations, but rather to determine whether the Commission has demonstrated that the regulations fall within the scope of its statutory grant of authority.

## II.

The Commission cites numerous statutory provisions it claims grant it the power to promulgate the *Open Internet Order* rules. But we start and end our analysis with section 706 of the 1996 Telecommunications Act, which, as we shall explain, furnishes the Commission with the requisite affirmative authority to adopt the regulations.

Section 706(a) provides:

> The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

47 U.S.C. § 1302(a). Section 706(b), in turn, requires the Commission to conduct a regular inquiry "concerning the availability of advanced telecommunications capability." *Id.* § 1302(b). It further provides that should the Commission find that "advanced telecommunications capability is [not] being

deployed to all Americans in a reasonable and timely fashion," it "shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market." *Id.* The statute defines "advanced telecommunications capability" to include "broadband telecommunications capability." *Id.* § 1302(d)(1).

Verizon contends that neither subsection (a) nor (b) of section 706 confers any regulatory authority on the Commission. As Verizon sees it, the two subsections amount to nothing more than congressional statements of policy. Verizon further contends that even if either provision grants the Commission substantive authority, the scope of that grant is not so expansive as to permit the Commission to regulate broadband providers in the manner that the *Open Internet Order* rules do. In addressing these questions, we apply the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). As the Supreme Court has recently made clear, *Chevron* deference is warranted even if the Commission has interpreted a statutory provision that could be said to delineate the scope of the agency's jurisdiction. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1874 (2013). Thus, if we determine that the Commission's interpretation of section 706 represents a reasonable resolution of a statutory ambiguity, we must defer to that interpretation. *See Chevron*, 467 U.S. at 842–43. The *Chevron* inquiry overlaps substantially with that required by the Administrative Procedure Act (APA), pursuant to which we must also determine whether the Commission's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see National Ass'n of Regulatory Utility Commissioners v. Interstate Commerce Commission*, 41 F.3d 721, 726–27 (D.C. Cir. 1994).

**A.**

This is not the first time the Commission has asserted that section 706(a) grants it authority to regulate broadband providers. Advancing a similar argument in *Comcast*, the Commission contended that section 706(a) provided a statutory hook for its exercise of ancillary jurisdiction. Although we thought that section 706(a) might "arguably be read to delegate regulatory authority to the Commission," we concluded that the Commission could not rely on this provision to justify the *Comcast Order* because it had previously determined, in the still-binding *Advanced Services Order*, that the provision "'does not constitute an independent grant of authority.'" *Comcast*, 600 F.3d at 658 (quoting *Advanced Services Order*, 13 F.C.C.R. at 24047 ¶ 77). We rejected the Commission's claim that the *Advanced Services Order* concluded only that section 706(a) granted it no forbearance authority—authority to relieve regulated entities of statutory obligations to which they would otherwise be subject, *see* 47 U.S.C. § 160—over and above that given it elsewhere in the Communications Act. *Comcast*, 600 F.3d at 658. Indeed, the *Advanced Services Order* was clearly far broader, explicitly declaring: "section 706(a) does not constitute an independent grant of forbearance authority *or of authority to employ other regulating methods*." *Advanced Services Order*, 13 F.C.C.R. at 24044 ¶ 69 (emphasis added). Because the Commission had "never questioned, let alone overruled, that understanding of section 706," we held that it "remain[ed] bound" by its prior interpretation. *Comcast*, 600 F.3d at 659.

But the Commission need not remain *forever* bound by the *Advanced Services Order*'s restrictive reading of section 706(a). "An initial agency interpretation is not instantly carved in stone." *Chevron*, 467 U.S. at 863. The APA's requirement of reasoned decision-making ordinarily demands that an agency

acknowledge and explain the reasons for a changed interpretation. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."); *Brand X*, 545 U.S. at 981 ("Unexplained inconsistency is, at most, a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act."). But so long as an agency "adequately explains the reasons for a reversal of policy," its new interpretation of a statute cannot be rejected simply because it is new. *Brand X*, 545 U.S. at 981. At the time we issued our *Comcast* opinion, the Commission failed to satisfy this requirement, as its assertion that section 706(a) gave it regulatory authority represented, at that point, an attempt to "'depart from a prior policy *sub silentio*.'" *Comcast*, 600 F.3d at 659 (quoting *Fox*, 556 U.S. at 515).

In the *Open Internet Order*, however, the Commission has offered a reasoned explanation for its changed understanding of section 706(a). To be sure, the *Open Internet Order* evinces a palpable reluctance to accept this court's interpretation of the *Advanced Services Order*, as the Commission again attempts to reconcile its current understanding of section 706(a) with its prior interpretation*. See Open Internet Order*, 25 F.C.C.R. at 17969 ¶ 119 (characterizing the *Advanced Services Order* as being "consistent with [the Commission's] present understanding"). Of course, such reluctance hardly makes the Commission's decision unreasonable, as it is free to express its disagreement with this court's holdings. After all, even a federal agency is entitled to a little pride. Moreover, although the *Open Internet Order* inaccurately describes the *Advanced Services Order*'s actual conclusion, it does describe what the *Order* likely *should* have concluded. Specifically, the *Advanced Services Order*'s rejection of section 706(a) as a source of substantive authority rested almost entirely on the

notion that a contrary interpretation would somehow permit the Commission to evade express statutory commands forbidding it from using its forbearance authority in certain circumstances. *See Advanced Services Order*, 13 F.C.C.R. at 24045–46 ¶¶ 72–73. This makes little sense. By the same reasoning, one might say that Article I of the Constitution gives Congress no substantive authority because Congress might otherwise be able to use that authority in a way that violates the Ex Post Facto Clause. The *Open Internet Order* characterizes the *Advanced Services Order* as simply "disavowing a reading of Section 706(a) that would allow the agency to trump specific mandates of the Communications Act," thus honoring "the interpretive canon that '[a] specific provision . . . controls one[] of more general application.'" *Open Internet Order*, 25 F.C.C.R. at 17969 ¶¶ 118–119 (quoting *Bloate v. United States*, 559 U.S. 196, 207 (2010)). Perhaps the Commission should have more openly acknowledged that it was not actually describing the *Advanced Services Order*, but instead rewriting it in a more logical manner. In this latter task, however, the Commission succeeded: its reinterpretation of the *Advanced Services Order* was more reasonable than the *Advanced Services Order* itself.

In any event—and more important for our purposes—the Commission expressly declared: "To the extent that the *Advanced Services Order* can be construed as having read Section 706(a) differently, we reject that reading of the statute for the reasons discussed in the text." *Open Internet Order*, 25 F.C.C.R. at 17969 ¶ 119 n.370. Setting forth those "reasons" at some length, the Commission analyzed the statute's text, its legislative history, and the resultant scope of the Commission's authority, concluding that each of these considerations supports the view that section 706(a) constitutes an affirmative grant of regulatory authority. *Id.* at 17969–70 ¶¶ 119–121. In these circumstances, and contrary to Verizon's contentions, we

have no basis for saying that the Commission "casually ignored prior policies and interpretations or otherwise failed to provide a reasoned explanation" for its changed interpretation. *Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 710 (D.C. Cir. 2011) (internal quotation marks omitted).

The question, then, is this: Does the Commission's current understanding of section 706(a) as a grant of regulatory authority represent a reasonable interpretation of an ambiguous statute? We believe it does.

Recall that the provision directs the Commission to "encourage the deployment . . . of advanced telecommunications capability . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a). As Verizon argues, this language could certainly be read as simply setting forth a statement of congressional policy, directing the Commission to employ "regulating methods" already at the Commission's disposal in order to achieve the stated goal of promoting "advanced telecommunications" technology. But the language can just as easily be read to vest the Commission with actual authority to utilize such "regulating methods" to meet this stated goal. As the Commission put it in the *Open Internet Order*, one might reasonably think that Congress, in directing the Commission to undertake certain acts, "necessarily invested the Commission with the statutory authority to carry out those acts." *Open Internet Order*, 25 F.C.C.R. at 17969 ¶ 120.

Section 706(a)'s reference to state commissions does not foreclose such a reading. Observing that the statute applies to both "[t]he Commission *and* each State commission with

regulatory jurisdiction over telecommunications services," 47 U.S.C. § 1302(a) (emphasis added), Verizon contends that Congress would not be expected to grant both the FCC and state commissions the regulatory authority to encourage the deployment of advanced telecommunications capabilities. But Congress has granted regulatory authority to state telecommunications commissions on other occasions, and we see no reason to think that it could not have done the same here. *See, e.g.*, *id.* § 251(f) (granting state commissions the authority to exempt rural local exchange carriers from certain obligations imposed on other incumbents); *id.* § 252(e) (requiring all interconnection agreements between incumbent local exchange carriers and entrant carriers to be approved by a state commission); *see also AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 385–86 (1999) (describing the Commission's power and responsibility to dictate the manner in which state commissions exercise such authority). Thus, Congress has not "directly spoken" to the question of whether section 706(a) is a grant of regulatory authority simply by mentioning state commissions in that grant. *Chevron*, 467 U.S. at 842.

This case, moreover, is a far cry from *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), on which Verizon principally relies. There, the Supreme Court held that "Congress ha[d] clearly precluded the [Food and Drug Administration] from asserting jurisdiction to regulate tobacco products." *Id.* at 126. The Court emphasized that the FDA had not only completely disclaimed any authority to regulate tobacco products, but had done so for more than eighty years, and that Congress had repeatedly legislated against this background. *See id.* at 143–59. The Court also observed that the FDA's newly adopted conclusion that it did in fact have authority to regulate this industry would, given its findings regarding the effects of tobacco products and its authorizing

statute, logically require the agency to ban such products altogether, a result clearly contrary to congressional policy. *See id.* at 135–43. Furthermore, the Court reasoned, if Congress had intended to "delegate a decision of such economic and political significance" to the agency, it would have done so far more clearly. *Id.* at 160.

The circumstances here are entirely different. Although the Commission once disclaimed authority to regulate under section 706(a), it never disclaimed authority to regulate the Internet or Internet providers altogether, nor is there any similar history of congressional reliance on such a disclaimer. To the contrary, as recounted above, *see supra* at 7–9, when Congress passed section 706(a) in 1996, it did so against the backdrop of the Commission's long history of subjecting to common carrier regulation the entities that controlled the last-mile facilities over which end users accessed the Internet. *See, e.g.*, *Second Computer Inquiry*, 77 F.C.C.2d at 473–74 ¶¶ 228–29. Indeed, one might have thought, as the Commission originally concluded, *see Advanced Services Order*, 13 F.C.C.R. at 24029–30 ¶ 35, that Congress clearly contemplated that the Commission would continue regulating Internet providers in the manner it had previously. *Cf. Brand X*, 545 U.S. at 1003 (Breyer, J., concurring) (concluding that the Commission's decision to exempt cable broadband providers from Title II regulation was "perhaps just barely" within the scope of the agency's "statutorily delegated authority"); *id.* at 1005 (Scalia, J., dissenting) (arguing that Commission's decision "exceeded the authority given it by Congress"). In fact, section 706(a)'s legislative history suggests that Congress may have, somewhat presciently, viewed that provision as an affirmative grant of authority to the Commission whose existence would become necessary if other contemplated grants of statutory authority were for some reason unavailable. The Senate Report describes section 706 as a "necessary

fail-safe" "intended to ensure that one of the primary objectives of the [Act]—to accelerate deployment of advanced telecommunications capability—is achieved." S. Rep. No. 104-23 at 50–51. As the Commission observed in the *Open Internet Order*, it would be "odd . . . to characterize Section 706(a) as a 'fail-safe' that 'ensures' the Commission's ability to promote advanced services if it conferred no actual authority." 25 F.C.C.R. at 17970 ¶ 120.

Verizon directs our attention to a number of bills introduced in Congress subsequent to the passage of the 1996 Act that, if enacted, would have imposed requirements on broadband providers similar to those embodied in the Commission's *Open Internet Order. See, e.g.*, Internet Non-Discrimination Act of 2006, S. 2360, 109th Cong. (2006). Such subsequent legislative history, however, provides "'an unreliable guide to legislative intent.'" *North Broward Hospital District v. Shalala*, 172 F.3d 90, 98 (D.C. Cir. 1999) (quoting *Chapman v. United States*, 500 U.S. 453, 464 n.4 (1991)). Moreover, even assuming that Congress's failure to impose such restrictions would itself cast light on Congress's understanding of the Commission's power to do so, any such inferences would be largely countered by Congress's similar failure to adopt a proposed resolution that would have specifically disapproved of the Commission's promulgation of the *Open Internet Order. See* H.J. Res. 37, 112th Cong. (2011). These conflicting pieces of subsequent failed legislation tell us little if anything about the original meaning of the Telecommunications Act of 1996.

Thus, although regulation of broadband Internet providers certainly involves decisions of great "economic and political significance," *Brown & Williamson*, 529 U.S. at 160, we have little reason given this history to think that Congress could not have delegated some of these decisions to the

Commission. To be sure, Congress does not, as Verizon reminds us, "hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001). But FCC regulation of broadband providers is no elephant, and section 706(a) is no mousehole.

Of course, we might well hesitate to conclude that Congress intended to grant the Commission substantive authority in section 706(a) if that authority would have no limiting principle. *See Comcast*, 600 F.3d at 655 (rejecting Commission's understanding of its authority that "if accepted . . . would virtually free the Commission from its congressional tether"); *cf. Whitman*, 531 U.S. at 472–73 (discussing the nondelegation doctrine). But we are satisfied that the scope of authority granted to the Commission by section 706(a) is not so boundless as to compel the conclusion that Congress could never have intended the provision to set forth anything other than a general statement of policy. The Commission has identified at least two limiting principles inherent in section 706(a). *See Open Internet Order*, 25 F.C.C.R. at 17970 ¶ 121. First, the section must be read in conjunction with other provisions of the Communications Act, including, most importantly, those limiting the Commission's subject matter jurisdiction to "interstate and foreign communication by wire and radio." 47 U.S.C. § 152(a). Any regulatory action authorized by section 706(a) would thus have to fall within the Commission's subject matter jurisdiction over such communications—a limitation whose importance this court has recognized in delineating the reach of the Commission's ancillary jurisdiction. *See American Library Ass'n*, 406 F.3d at 703–04. Second, any regulations must be designed to achieve a particular purpose: to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." 47 U.S.C. § 1302(a). Section 706(a) thus gives the Commission authority to promulgate only

those regulations that it establishes will fulfill this specific statutory goal—a burden that, as we trust our searching analysis below will demonstrate, is far from "meaningless." Dissenting Op. at 7.

**B.**

Section 706(b) has a less tortured history. Until shortly before the Commission issued the *Open Internet Order*, it had never considered whether the provision vested it with any regulatory authority. The Commission had no need to do so because prior to that time it had made no determination that advanced telecommunications technologies, including broadband Internet access, were not "being deployed to all Americans in a reasonable and timely fashion," the prerequisite for any purported invocation of authority to "take immediate action to accelerate deployment of such capability" under section 706(b). 47 U.S.C. § 1302(b).

In July 2010, however, the Commission concluded that "broadband deployment to *all* Americans is not reasonable and timely." *Sixth Broadband Deployment Report*, 25 F.C.C.R. at 9558 ¶ 2. This conclusion, the Commission recognized, represented a deviation from its five prior assessments. *Id.* at 9558 ¶ 2 & n.8. According to the Commission, the change was driven by its decision to raise the minimum speed threshold qualifying as broadband. *Id.* at 9558 ¶ 4. "Broadband," as defined in the 1996 Telecommunications Act, is Internet service furnished at speeds that "enable[] users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology." 47 U.S.C. § 1302(d)(1). In 1999, the Commission found this requirement satisfied by services "having the capability of supporting . . . a speed . . . in excess of 200 kilobits per second (kbps) in the last mile." *In re Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a*

*Reasonable and Timely Fashion*, 14 F.C.C.R. 2398, 2406 ¶ 20 (1999). The Commission chose this threshold because it was "enough to provide the most popular forms of broadband—to change web pages as fast as one can flip through the pages of a book and to transmit full-motion video." *Id.* That said, the Commission recognized that technological developments might someday require it to reassess the 200 kbps threshold. *Id.* at 2407–08 ¶ 25.

In the *Sixth Broadband Deployment Report*, the Commission decided that day had finally arrived. The Commission explained that consumers now regularly use their Internet connections to access high-quality video and expect to be able at the same time to check their email and browse the web. *Sixth Broadband Deployment Report*, 25 F.C.C.R. at 9562–64 ¶¶ 10–11. Two hundred kbps, the Commission determined, "simply is not enough bandwidth" to permit such uses. *Id.* at 9562 ¶ 10. The Commission thus adopted a new threshold more appropriate to current consumer behavior and expectations: four megabytes per second (mbps) for end users to download content from the Internet—twenty times as fast as the prior threshold—and one mbps for end users to upload content. *Id.* at 9563 ¶ 11.

Applying this new benchmark, the Commission found that "roughly 80 million American adults do not subscribe to broadband at home, and approximately 14 to 24 million Americans do not have access to broadband today." *Sixth Broadband Deployment Report*, 25 F.C.C.R. at 9574 ¶ 28. Given these figures and the "ever-growing importance of broadband to our society," the Commission was unable to find "that broadband is being reasonably and timely deployed" within the meaning of section 706(b). *Id.* This conclusion, it explained, triggered section 706(b)'s mandate that the Commission "take immediate action to accelerate

deployment." *Id.* at 9558 ¶ 3 (quoting 47 U.S.C. § 1302(b)) (internal quotation marks omitted).

Subsequently, in the *Open Internet Order* the Commission made clear that this statutory provision does not limit the Commission to using other regulatory authority already at its disposal, but instead grants it the power necessary to fulfill the statute's mandate. *See Open Internet Order*, 25 F.C.C.R. at 17972 ¶ 123. Emphasizing the provision's "shall take immediate action" directive, the Commission concluded that section 706(b) "provides express authority" for the rules it adopted. *Id.*

Contrary to Verizon's arguments, we believe the Commission has reasonably interpreted section 706(b) to empower it to take steps to accelerate broadband deployment if and when it determines that such deployment is not "reasonable and timely." To be sure, as with section 706(a), it is unclear whether section 706(b), in providing that the Commission "shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market," vested the Commission with authority to remove such barriers to infrastructure investment and promote competition. 47 U.S.C. § 1302(b). But the provision may certainly be read to accomplish as much, and given such ambiguity we have no basis for rejecting the Commission's determination that it should be so understood. *See Chevron*, 467 U.S. at 842–43. Moreover, as discussed above with respect to section 706(a), *see supra* at 24–27, nothing in the regulatory background or the legislative history either before or after passage of the 1996 Telecommunications Act forecloses such an understanding. We think it quite reasonable to believe that Congress contemplated that the Commission would regulate this industry, as the agency had in

the past, and the scope of any authority granted to it by section 706(b)—limited, as it is, both by the boundaries of the Commission's subject matter jurisdiction and the requirement that any regulation be tailored to the specific statutory goal of accelerating broadband deployment—is not so broad that we might hesitate to think that Congress could have intended such a delegation.

Verizon makes two additional arguments regarding the Commission's interpretation of section 706(b), both of which we can dispose of in relatively short order.

First, Verizon contends that if section 706(b) gives the Commission any regulatory authority, that authority must be understood in conjunction with section 706(c), which directs the Commission to "compile a list of geographical areas that are not served by any provider of advanced telecommunications capability." 47 U.S.C. § 1302(c). Thus, Verizon claims, any regulations that the Commission might adopt pursuant to section 706(b) may not "reach beyond any particular 'geographical areas that are not served' by any broadband provider and apply throughout the country." Verizon's Br. 33 (emphasis omitted). By its own terms, however, section 706(c) describes simply "*part of the inquiry*" that section 706(b) requires the Commission to conduct concerning broadband deployment. 47 U.S.C. § 1302(c) (emphasis added). It nowhere purports to delineate all aspects of that inquiry. Nor does it limit the actions that the Commission may take if, in the course of that inquiry, it determines that broadband deployment has not been "reasonable and timely."

Second, Verizon asserts that the *Sixth Broadband Deployment Report*'s finding that triggered section 706(b)'s grant of regulatory authority "arbitrarily contravened five prior

agency determinations of reasonable and timely deployment." Verizon's Br. 33. The timing of the Commission's determination is certainly suspicious, coming as it did closely on the heels of our rejection in *Comcast* of the legal theory on which the Commission had until then relied to establish its authority over broadband providers. But questionable timing, by itself, gives us no basis to reject an otherwise reasonable finding. Beyond its general assertion that the Commission's finding was "arbitrar[y]," Verizon offers no specific reason for thinking that the Commission's logical and carefully reasoned determination was illegitimate. We can see none.

## C.

This brings us, then, to Verizon's alternative argument that even if, as we have held, sections 706(a) and 706(b) grant the Commission affirmative authority to promulgate rules governing broadband providers, the specific rules imposed by the *Open Internet Order* fall outside the scope of that authority. The Commission's theory, to reiterate, is that its regulations protect and promote edge-provider investment and development, which in turn drives end-user demand for more and better broadband technologies, which in turn stimulates competition among broadband providers to further invest in broadband. *See Open Internet Order*, 25 F.C.C.R. at 17910–11, 17970 ¶¶ 14, 120. Thus, the Commission claims, by preventing broadband providers from blocking or discriminating against edge providers, the rules "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans," 47 U.S.C. § 1302(a), and "accelerate deployment of such capability," *id.* § 1302(b), by removing "barriers to infrastructure investment" and promoting "competition," *id.* § 1302(a), (b). *See Open Internet Order*, 25 F.C.C.R. at 17968, 17972 ¶¶ 117, 123. That is, contrary to the dissent, *see* Dissenting Op. at 2–7, the Commission made clear—and Verizon appears to

recognize—that the Commission found broadband providers' potential disruption of edge-provider traffic to be itself the sort of "barrier" that has "the potential to stifle overall investment in Internet infrastructure," and could "limit competition in telecommunications markets." *Open Internet Order*, 25 F.C.C.R. at 17970 ¶ 120.

Verizon mounts a twofold challenge to this rationale. It argues that the *Open Internet Order* regulations will not, as the Commission claims, meaningfully promote broadband deployment, and that even if they do advance this goal, the manner in which they do so is too attenuated from this statutory purpose to fall within the scope of authority granted by either statutory provision.

We begin with the second, more strictly legal, question of whether, assuming the Commission has accurately predicted the effect of these regulations, it may utilize the authority granted to it in sections 706(a) and 706(b) to impose regulations of this sort on broadband providers. As we have previously acknowledged, "in proscribing . . . practices with the statutorily identified effect, an agency might stray so far from the paradigm case as to render its interpretation unreasonable, arbitrary, or capricious." *National Cable & Telecommunications Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009). Here, Verizon has given us no reason to conclude that the *Open Internet Order*'s requirements "stray" so far beyond the "paradigm case" that Congress likely contemplated as to render the Commission's understanding of its authority unreasonable. The rules not only apply directly to broadband providers, the precise entities to which section 706 authority to encourage broadband deployment presumably extends, but also seek to promote the very goal that Congress explicitly sought to promote. Because the rules advance this statutory goal of broadband deployment by first promoting

edge-provider innovations and end-user demand, Verizon derides the Commission's justification as a "triple-cushion shot." Verizon's Br. 28. In billiards, however, a triple-cushion shot, although perhaps more difficult to complete, counts the same as any other shot. The Commission could reasonably have thought that its authority to promulgate regulations that promote broadband deployment encompasses the power to regulate broadband providers' economic relationships with edge providers if, in fact, the nature of those relationships influences the rate and extent to which broadband providers develop and expand their services for end users. *See Cablevision*, 649 F.3d at 709 (holding that Commission had not impermissibly "reached beyond the paradigm case" in "interpreting a statute focused on the provision of satellite programming to authorize terrestrial withholding regulations," because cable companies' ability to withhold terrestrial programming would, in turn, discourage potential competitors from entering the market to provide satellite programming) (internal quotation marks omitted).

Whether the Commission's assessment of the likely effects of the *Open Internet Order* deserves credence presents a slightly more complex question. Verizon attacks the reasoning and factual support underlying the Commission's "triple-cushion shot" theory, advancing these arguments both as an attack on the Commission's statutory interpretation and as an APA arbitrary and capricious challenge. Given that these two arguments involve similar considerations, we address them together. In so doing, "we must uphold the Commission's factual determinations if on the record as a whole, there is such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Secretary of Labor, MSHA v. Federal Mine Safety & Health Review Comm'n*, 111 F.3d 913, 918 (D.C. Cir. 1997) (internal quotation marks omitted); *see* 5 U.S.C. § 706(2)(E). We evaluate the

Commission's reasoning to ensure that it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (quoting *Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). When assessing the reasonableness of the Commission's conclusions, we must be careful not to simply "'substitute [our] judgment for that of the agency,'" especially when the "agency's predictive judgments about the likely economic effects of a rule" are at issue. *National Telephone Cooperative Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43). Under these standards, the Commission's prediction that the *Open Internet Order* regulations will encourage broadband deployment is, in our view, both rational and supported by substantial evidence.

To begin with, the Commission has more than adequately supported and explained its conclusion that edge-provider innovation leads to the expansion and improvement of broadband infrastructure. The Internet, the Commission observed in the *Open Internet Order*, is, "[l]ike electricity and the computer," a "'general purpose technology' that enables new methods of production that have a major impact on the entire economy." *Open Internet Order*, 25 F.C.C.R. at 17909 ¶ 13. Certain innovations—the lightbulb, for example—create a need for infrastructure investment, such as in power generation facilities and distribution lines, that complement and further drive the development of the initial innovation and ultimately the growth of the economy as a whole. *See* Timothy F. Bresnahan & M. Trajtenberg, *General purpose technologies: 'Engines of Growth'?* 65 J. ECONOMETRICS 83, 84 (1995), *cited in Open Internet Order*, 25 F.C.C.R. at 17909 ¶ 13 n.12; *see also* Amicus Br. of Internet Engineers and

Technologists 17 (citing *Hearing on Internet Security Before the H. Comm. on Science, Space, and Technology*, 103d Cong. (Mar. 22, 1994) (written testimony of Dr. Vinton G. Cerf)). The rise of streaming online video is perhaps the best and clearest example the Commission used to illustrate that the Internet constitutes one such technology: higher-speed residential Internet connections in the late 1990s "stimulated" the development of streaming video, a service that requires particularly high bandwidth, "which in turn encouraged broadband providers to increase network speeds." *Open Internet Order*, 25 F.C.C.R. at 17911 ¶ 14 n.23. The Commission's emphasis on this connection between edge-provider innovation and infrastructure development is uncontroversial. Indeed, in its comments to the Commission, Verizon, executing a triple-cushion shot of its own, acknowledged:

> [T]he social and economic fruits of the Internet economy are the result of a virtuous cycle of innovation and growth between that ecosystem and the underlying infrastructure—the infrastructure enabling the development and dissemination of Internet-based services and applications, with the demand and use of those services . . . driving improvements in the infrastructure which, in turn, support further innovations in services and applications.

Verizon Comments at 42, Docket No. 09-191 (Jan. 14, 2010) (internal quotation marks omitted).

The Commission's finding that Internet openness fosters the edge-provider innovation that drives this "virtuous cycle" was likewise reasonable and grounded in substantial evidence. Continued innovation at the edge, the Commission explained,

"depends upon low barriers to innovation and entry by edge providers," and thus restrictions on edge providers' "ability to reach end users . . . reduce the rate of innovation." *Open Internet Order*, 25 F.C.C.R. at 17911 ¶ 14. This conclusion finds ample support in the economic literature on which the Commission relied, *see, e.g.*, Joseph Farrell & Philip J. Weiser, *Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age*, 17 HARV. J. L. & TECH. 85, 95 (2003), *cited in Open Internet Order*, 25 F.C.C.R. at 17911 ¶ 14 n.25, as well as in history and the comments of several edge providers. For one prominent illustration of the relationship between openness and innovation, the Commission cited the invention of the World Wide Web itself by Sir Tim Berners-Lee, who, although not working for an entity that operated the underlying network, was able to create and disseminate this enormously successful innovation without needing to make any changes to previously developed Internet protocols or securing "any approval from network operators." *Open Internet Order*, 25 F.C.C.R. at 17910 ¶ 13 (citing, *inter alia*, TIM BERNERS-LEE, WEAVING THE WEB 16 (2000)). It also highlighted the comments of Google and Vonage—both innovative edge providers—who emphasized the importance of the Internet's open design to permitting new content and services to develop at the edge. *Id.* at 17911 ¶ 14 n.24 & n.25. The record amassed by the Commission contains many similar examples, and Verizon has given us no basis for questioning the Commission's determination that the preservation of Internet openness is integral to achieving the statutory objectives set forth in Section 706. *See id.* at 17910–11, 17968, 17972 ¶¶ 14, 117, 123.

Equally important, the Commission has adequately supported and explained its conclusion that, absent rules such as those set forth in the *Open Internet Order*, broadband

providers represent a threat to Internet openness and could act in ways that would ultimately inhibit the speed and extent of future broadband deployment. First, nothing in the record gives us any reason to doubt the Commission's determination that broadband providers may be motivated to discriminate against and among edge providers. The Commission observed that broadband providers—often the same entities that furnish end users with telephone and television services—"have incentives to interfere with the operation of third-party Internet-based services that compete with the providers' revenue-generating telephone and/or pay-television services." *Open Internet Order*, 25 F.C.C.R. at 17916 ¶ 22. As the Commission noted, Voice-over-Internet-Protocol (VoIP) services such as Vonage increasingly serve as substitutes for traditional telephone services, *id.*, and broadband providers like AT&T and Time Warner have acknowledged that online video aggregators such as Netflix and Hulu compete directly with their own "core video subscription service," *id.* at 17917 ¶ 22 & n.54; *see also id.* at 17918 ¶ 23 n.60 (finding that a study concluding that cable companies had sought to exclude networks that competed with the companies' own affiliated channels, *see* Austan Goolsbee, *Vertical Integration and the Market for Broadcast and Cable Television Programming*, Paper for the Federal Communications Commission 31–32 (Sept. 5, 2007), "provides empirical evidence that cable providers have acted in the past on anticompetitive incentives to foreclose rivals"). Broadband providers also have powerful incentives to accept fees from edge providers, either in return for excluding their competitors or for granting them prioritized access to end users. *See id.* at 17918–19 ¶¶ 23–24. Indeed, at oral argument Verizon's counsel announced that "but for [the *Open Internet Order*] rules we would be exploring those commercial arrangements." Oral Arg. Tr. 31. And although broadband providers might not adopt pay-for-priority agreements or other similar arrangements if, according to the Commission's

analysis, such agreements would ultimately lead to a decrease in end-user demand for broadband, the Commission explained that the resultant harms to innovation and demand will largely constitute "negative externalities": any given broadband provider will "receive the benefits of . . . fees but [is] unlikely to fully account for the detrimental impact on edge providers' ability and incentive to innovate and invest." *Open Internet Order*, 25 F.C.C.R. at 17919–20 ¶ 25 & n.68. Although Verizon dismisses the Commission's assertions regarding broadband providers' incentives as "pure speculation," Verizon's Br. 52, *see also* Dissenting Op. at 15, those assertions are, at the very least, speculation based firmly in common sense and economic reality.

Moreover, as the Commission found, broadband providers have the technical and economic ability to impose such restrictions. Verizon does not seriously contend otherwise. In fact, there appears little dispute that broadband providers have the technological ability to distinguish between and discriminate against certain types of Internet traffic. *See Open Internet Order*, 25 F.C.C.R. at 17923 ¶ 31 (broadband providers possess "increasingly sophisticated network management tools" that enable them to "make fine-grained distinction in their handling of network traffic"). The Commission also convincingly detailed how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic and charge for the services they furnish edge providers. Because all end users generally access the Internet through a single broadband provider, that provider functions as a "'terminating monopolist,'" *id.* at 17919 ¶ 24 n.66, with power to act as a "gatekeeper" with respect to edge providers that might seek to reach its end-user subscribers, *id.* at 17919 ¶ 24. As the Commission reasonably explained, this ability to act as a "gatekeeper" distinguishes broadband providers from other

participants in the Internet marketplace—including prominent and potentially powerful edge providers such as Google and Apple—who have no similar "control [over] access to the Internet for their subscribers and for anyone wishing to reach those subscribers." *Id.* at 17935 ¶ 50.

To be sure, if end users could immediately respond to any given broadband provider's attempt to impose restrictions on edge providers by switching broadband providers, this gatekeeper power might well disappear. *Cf. Open Internet Order*, 25 F.C.C.R. at 17935 ¶ 51 (declining to impose similar rules on "dial-up Internet access service because telephone service has historically provided the easy ability to switch among competing dial-up Internet access services"). For example, a broadband provider like Comcast would be unable to threaten Netflix that it would slow Netflix traffic if all Comcast subscribers would then immediately switch to a competing broadband provider. But we see no basis for questioning the Commission's conclusion that end users are unlikely to react in this fashion. According to the Commission, "end users may not know whether charges or service levels their broadband provider is imposing on edge providers vary from those of alternative broadband providers, and even if they do have this information may find it costly to switch." *Id.* at 17921 ¶ 27. As described by numerous commenters, and detailed more thoroughly in a Commission report compiling the results of an extensive consumer survey, the costs of switching include: "early termination fees; the inconvenience of ordering, installation, and set-up, and associated deposits or fees; possible difficulty returning the earlier broadband provider's equipment and the cost of replacing incompatible customer-owned equipment; the risk of temporarily losing service; the risk of problems learning how to use the new service; and the possible loss of a provider-specific email address or website." *Open Internet Order*, 25 F.C.C.R. at

17924–25 ¶ 34 (footnotes omitted) (citing, *inter alia*, Federal Communications Commission, *Broadband Decisions: What Drives Consumers to Switch—Or Stick With—Their Broadband Internet Provider* (FCC Working Paper, Dec. 2010), *available at* hraunfoss.fcc.gov/edocs_public/ attachmatch/DOC-303264A1.pdf). Moreover, the Commission emphasized, many end users may have no option to switch, or at least face very limited options: "[a]s of December 2009, nearly 70 percent of households lived in census tracts where only one or two wireline or fixed wireless firms provided" broadband service. *Id.* at 17923 ¶ 32. As the Commission concluded, any market power that such broadband providers might have with respect to end users would only increase their power with respect to edge providers. *Id.*

The dissent focuses on this latter aspect of the Commission's reasoning, arguing at some length that the Commission's failure to expressly find that broadband providers have market power with respect to end users is "fatal to its attempt to regulate." Dissenting Op. at 12. But Verizon has never argued that the Commission's failure to make a market power finding somehow rendered its understanding of its statutory authority unreasonable or its decision arbitrary and capricious. Verizon does fleetingly mention the market power issue once in its opening brief, asserting as part of its First Amendment claim that *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)—in which the Supreme Court, applying intermediate scrutiny, upheld a congressional statute compelling cable companies to carry local broadcast television stations, *id.* at 185—is distinguishable in part because, unlike the Commission here, Congress had found "evidence of 'considerable and growing market power.'" Verizon Br. 46 (quoting *Turner*, 520 U.S. at 197). But to say, as Verizon does, that an allegedly speech-infringing regulation violates the First

Amendment because of the absence of a market condition that would increase the need for that regulation is hardly to say that the absence of this market condition renders the regulation wholly irrational. Verizon's bare citation to a Justice Department submission—relied upon by the dissent, *see* Dissenting Op. at 11, 14–15—is even less on point, as that submission simply advised the Commission to take care to avoid stifling incentives for broadband investment; it never asserted, as the dissent does, that such market power is required for broadband providers to have the economic clout to restrict edge-provider traffic in the first place. *See* Department of Justice Comments at 28, Docket No. 09-51 (Jan. 14, 2010). Indeed, when pressed at oral argument to embrace our dissenting colleague's position, Verizon's counsel failed to do so, stating only that it was "possible" that if the Commission had made a market power finding, the *Order* could be justified. Oral Arg. Tr. 10. As we "do not sit as [a] self-directed board[] of legal inquiry and research," and Verizon "has made no attempt to address the issue," the argument is clearly forfeited. *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

In any event, it seems likely that the reason Verizon never advanced this argument is that the Commission's failure to find market power is not "fatal" to its theory. Broadband providers' ability to impose restrictions on edge providers does not depend on their benefiting from the sort of market concentration that would enable them to impose substantial price increases on end users—which is all the Commission said in declining to make a market power finding. *See Open Internet Order*, 25 F.C.C.R. at 17923 ¶ 32 & n.87; *see also* Department of Justice & Federal Trade Commission, Horizontal Merger Guidelines § 4.1 (2010) (defining product markets and market power in terms of a firm's ability to raise prices for consumers). Rather, broadband providers' ability to impose restrictions on edge providers simply depends on end

users not being fully responsive to the imposition of such restrictions. *See supra* at 39. If the dissent believes that broadband providers' ability to restrict edge-provider traffic without having their end users react would itself represent an exercise of market power, then the dissent's dispute with the Commission's reasoning appears to be largely semantic: the Commission expressly found that end users are not responsive in this fashion even if it never used the term "market power" in doing so. *See Open Internet Order*, 25 F.C.C.R. at 17924–25 ¶ 34.

Furthermore, the Commission established that the threat that broadband providers would utilize their gatekeeper ability to restrict edge-provider traffic is not, as the Commission put it, "merely theoretical." *Open Internet Order,* 25 F.C.C.R. at 17925 ¶ 35. In support of its conclusion that broadband providers could and would act to limit Internet openness, the Commission pointed to four prior instances in which they had done just that. These involved a mobile broadband provider blocking online payment services after entering into a contract with a competing service; a mobile broadband provider restricting the availability of competing VoIP and streaming video services; a fixed broadband provider blocking VoIP applications; and, of course, Comcast's impairment of peer-to-peer file sharing that was the subject of the *Comcast Order*. *See id.* Although some of these incidents may not have involved "adjudicated findings of misconduct," as Verizon asserts, Verizon's Br. 50, that hardly means that no record evidence supports the Commission's conclusion that the incidents had in fact occurred. Likewise, the fact that we vacated the *Comcast Order*—rendering it, according to Verizon, a "legal nullity," Verizon's Br. 51—did not require the Commission to entirely disregard the underlying conduct that produced that order. In *Comcast*, we held that the Commission had failed to cite any statutory authority that

justified its order, not that Comcast had never impaired Internet traffic. *See Comcast*, 600 F.3d at 644. Nor, finally, did the Commission's invocation of these examples demonstrate that it was attempting to "impose an 'industry-wide solution for a problem that exists only in isolated pockets.'" Verizon's Br. 51 (quoting *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1019 (D.C. Cir. 1987)). Rather, as the Commission explained, these incidents—which occurred "notwithstanding the Commission's adoption of open Internet principles," Commission enforcement proceedings against those who violated those principles, and specific Commission orders "requir[ing] certain broadband providers to adhere to open Internet obligations," *Open Internet Order*, 25 F.C.C.R. at 17926–27 ¶ 37—buttressed the agency's conclusion that broadband providers' incentives and ability to restrict Internet traffic could produce "[w]idespread interference with the Internet's openness" in the absence of Commission action, *id.* at 17927 ¶ 38. Such a "problem" is doubtless "industry-wide." *Associated Gas Distributors*, 824 F.2d at 1019.

Finally, Verizon argues that the *Open Internet Order* rules will necessarily have the opposite of their intended effect because they will "harm innovation and deter investment by increasing costs, foreclosing potential revenue streams, and restricting providers' ability to meet consumers' evolving needs." Verizon's Br. 52; *see also* Dissenting Op. at 14–16. In essence, Verizon believes that any stimulus to edge-provider innovation, as well as any consequent demand for broadband infrastructure, produced by the *Open Internet Order* will be outweighed by the diminished incentives for broadband infrastructure investment caused by the new limitations on business models broadband providers may employ to reap a return on their investment. As Verizon points out, two members of the Commission agreed that the rules would be counterproductive, and several commenters contended that

certain regulations of broadband providers would run the risk of stifling infrastructure investment. *See Open Internet Order*, 25 F.C.C.R. at 18054–56 (Dissenting Statement of Commissioner McDowell); *id.* at 18088–91 (Dissenting Statement of Commissioner Baker); Verizon Comments at 40–86, Docket No. 09-191 (Jan. 14, 2010); MetroPCS Comments at 24–35, Docket No. 09-191 (Jan 14, 2010); *see also Open Internet Order*, 25 F.C.C.R. at 17931 ¶ 42 n.143 (discussing the comments of the Department of Justice and Federal Trade Commission).

The record, however, also contains much evidence supporting the Commission's conclusion that, "[b]y comparison to the benefits of [its] prophylactic measures, the costs associated with the open Internet rules . . . are likely small." *Open Internet Order*, 25 F.C.C.R. at 17928 ¶ 39. This is, in other words, one of those cases—quite frequent in this circuit—where "the available data do[] not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion." *State Farm*, 463 U.S. at 52. Here the Commission reached its "policy conclusion" by emphasizing, among other things, (1) the absence of evidence that similar restrictions of broadband providers had discouraged infrastructure investment, and (2) the strength of the effect on broadband investment that it anticipated from edge-provider innovation, which would benefit both from the preservation of the "virtuous circle of innovation" created by the Internet's openness and the increased certainty in that openness engendered by the Commission's rules. *Open Internet Order*, at 17928–31 ¶¶ 40–42. In so doing, the Commission has offered "a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 52 (internal quotation marks omitted), and Verizon has given us no persuasive reason to question that judgment.

**III.**

Even though section 706 grants the Commission authority to promote broadband deployment by regulating how broadband providers treat edge providers, the Commission may not, as it recognizes, utilize that power in a manner that contravenes any specific prohibition contained in the Communications Act. *See Open Internet Order*, 25 F.C.C.R. at 17969 ¶ 119 (reiterating the Commission's disavowal of "a reading of Section 706(a) that would allow the agency to trump specific mandates of the Communications Act"); *see also D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932) ("General language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."). According to Verizon, the Commission has done just that because the anti-discrimination and anti-blocking rules "subject[] broadband Internet access service . . . to common carriage regulation, a result expressly prohibited by the Act." Verizon's Br. 14.

We think it obvious that the Commission would violate the Communications Act were it to regulate broadband providers as common carriers. Given the Commission's still-binding decision to classify broadband providers not as providers of "telecommunications services" but instead as providers of "information services," *see supra* at 9–10, such treatment would run afoul of section 153(51): "A telecommunications carrier shall be treated as a common carrier under this [Act] only to the extent that it is engaged in providing telecommunications services." 47 U.S.C. § 153(51); *see also Wireless Broadband Order*, 22 F.C.C.R. at 5919 ¶ 50 (concluding that a "service provider is to be treated as a common carrier for the telecommunications services it provides, but it cannot be treated as a common carrier with

respect to other, non-telecommunications services it may offer, including information services"). Likewise, because the Commission has classified mobile broadband service as a "private" mobile service, and not a "commercial" mobile service, *see Wireless Broadband Order*, 22 F.C.C.R. at 5921 ¶ 56, treatment of mobile broadband providers as common carriers would violate section 332: "A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this [Act]." 47 U.S.C. § 332(c)(2); *see Cellco*, 700 F.3d at 538 ("[M]obile-data providers are statutorily immune, perhaps twice over, from treatment as common carriers.").

Insisting it has transgressed neither of these prohibitions, the Commission begins with the rather half-hearted argument that the Act referred to in sections 153(51) and 332 is the Communications Act of 1934, and that when the Commission utilizes the authority granted to it in section 706—enacted as part of the 1996 Telecommunications Act—it is not acting "under" the 1934 Act, and thus is "not subject to the statutory limitations on common-carrier treatment." Commission's Br. 68. But section 153(51) was also part of the 1996 Telecommunications Act. And regardless, "Congress expressly directed that the 1996 Act . . . be inserted into the Communications Act of 1934." *AT & T Corp.*, 525 U.S. at 377 (citing Telecommunications Act of 1996 § 1(b)). The Commission cannot now so easily escape the statutory prohibitions on common carrier treatment.

Thus, we must determine whether the requirements imposed by the *Open Internet Order* subject broadband providers to common carrier treatment. If they do, then given the manner in which the Commission has chosen to classify broadband providers, the regulations cannot stand. We apply

*Chevron*'s deferential standard of review to the interpretation and application of the statutory term "common carrier." *See Cellco*, 700 F.3d at 544. After first discussing the history and use of that term, we turn to the issue of whether the Commission's interpretation of "common carrier"—and its conclusion that the *Open Internet Order*'s rules do not constitute common carrier obligations—was reasonable.

**A.**

Offering little guidance as to the meaning of the term "common carrier," the Communications Act defines that phrase, somewhat circularly, as "any person engaged as a common carrier for hire." 47 U.S.C. § 153(11). Courts and the Commission have therefore resorted to the common law to come up with a satisfactory definition. *See FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 n.10 (1979) ("*Midwest Video II*").

In the Nineteenth Century, American courts began imposing certain obligations—conceptually derived from the traditional legal duties of innkeepers, ferrymen, and others who served the public—on companies in the transportation and communications industries. *See Cellco*, 700 F.3d at 545. As the Supreme Court explained in *Interstate Commerce Commission v. Baltimore & Ohio Railroad Co.*, 145 U.S. 263, 275 (1892), "the principles of the common law applicable to common carriers . . . demanded little more than that they should carry for all persons who applied, in the order in which the goods were delivered at the particular station, and that their charges for transportation should be reasonable." Congress subsequently codified these duties, first in the 1887 Interstate Commerce Act, ch. 104, 24 Stat. 379, then the Manns-Elkins Act of 1910, ch. 309, 36 Stat. 539, and, most relevant here, the Communications Act of 1934, ch. 652, 48 Stat. 1064. *See Cellco*, 700 F.3d at 545–46.

Although the nature and scope of the duties imposed on common carriers have evolved over the last century, *see, e.g.*, *Orloff v. FCC*, 352 F.3d 415, 418–21 (D.C. Cir. 2003) (discussing the implications of the relaxation of the tariff-filing requirement), the core of the common law concept of common carriage has remained intact. In *National Association of Regulatory Utility Commissioners v. FCC*, 525 F.2d 630, 642 (D.C. Cir. 1976) ("*NARUC I*"), we identified the basic characteristic that distinguishes common carriers from "private" carriers—i.e., entities that are not common carriers—as "[t]he common law requirement of holding oneself out to serve the public indiscriminately." "[A] carrier will not be a common carrier," we further explained, "where its practice is to make individualized decisions, in particular cases, whether and on what terms to deal." *Id.* at 641. Similarly, in *National Association of Regulatory Utility Commissioners v. FCC*, 533 F.2d 601, 608 (1976) ("*NARUC II*"), we concluded that "the primary *sine qua non* of common carrier status is a quasi-public character, which arises out of the undertaking to carry for all people indifferently." (Internal quotation marks omitted).

For our purposes, perhaps the seminal case applying this notion of common carriage is *Midwest Video II*. At issue in *Midwest Video II* was a set of regulations compelling cable television systems to operate a minimum number of channels and to hold certain channels open for specific users. 440 U.S. at 692–93. Cable operators were barred from exercising any discretion over who could use those latter channels and what those users could transmit. They were also forbidden from charging users any fee for some of the channels and limited to charging an "appropriate" fee for the remaining channels. *Id.* at 693–94. Because at that time the Commission had no express statutory authority over cable systems, it sought to justify these

rules as ancillary to its authority to regulate broadcasting. *Id.* at 696–99.

Rejecting this argument, the Supreme Court held that the Commission had no power to regulate cable operators in this fashion. The Court reasoned that if the Commission sought to exercise such ancillary jurisdiction over cable operators on the basis of its authority over broadcasters, it must also respect the specific statutory limits of that authority, as "without reference to the provisions of the Act directly governing broadcasting, the Commission's jurisdiction . . . would be unbounded." *Midwest Video II*, 440 U.S. at 706. Congress had expressly prohibited the Commission from regulating broadcasters as common carriers, a limitation that must then, according to the Court, also extend to cable operators. *Id.* at 707. And the challenged regulations, the Court held, "plainly impose common-carrier obligations on cable operators." *Id.* at 701. In explaining this conclusion, the Court largely reiterated the nature of the obligations themselves: "Under the rules, cable systems are required to hold out dedicated channels on a first-come, nondiscriminatory basis. Operators are prohibited from determining or influencing the content of access programming. And the rules delimit what operators may charge for access and use of equipment." *Id.* at 701–02 (internal citations omitted).

In *Cellco*, we recently confronted the similar question of whether a Commission regulation compelling mobile telephone companies to offer data roaming agreements to one another on "commercially reasonable" terms impermissibly regulated these providers as common carriers. 700 F.3d at 537. From the history and decisions surveyed above, we distilled "several basic principles" that guide our analysis here. *Id.* at 547. First, "[i]f a carrier is forced to offer service indiscriminately and on general terms, then that carrier is being

relegated to common carrier status." *Id.* We also clarified, however, that "there is an important distinction between the question whether a given regulatory regime is *consistent* with common carrier or private carrier status, and the *Midwest Video II* question whether that regime *necessarily confers* common carrier status." *Id.* (internal citations omitted). Thus, "common carriage is not all or nothing—there is a gray area in which although a given regulation might be applied to common carriers, the obligations imposed are not common carriage *per se*." *Id.* In this "space between *per se* common carriage and *per se* private carriage," we continued, "the Commission's determination that a regulation does or does not confer common carrier status warrants deference." *Id.*

Given these principles, we concluded that the data roaming rule imposed no *per se* common carriage requirements because it left "substantial room for individualized bargaining and discrimination in terms." *Cellco*, 700 F.3d at 548. The rule "expressly permit[ted] providers to adapt roaming agreements to 'individualized circumstances without having to hold themselves out to serve all comers indiscriminately on the same or standardized terms.'" *Id.* That said, we cautioned that were the Commission to apply the "commercially reasonable" standard in a restrictive manner, essentially elevating it to the traditional common carrier "just and reasonable" standard, *see* 47 U.S.C. § 201(b), the rule might impose obligations that amounted to common carriage *per se*, a claim that could be brought in an "as applied" challenge. *Cellco*, 700 F.3d at 548–49.

## B.

The Commission's explanation in the *Open Internet Order* for why the regulations do not constitute common carrier obligations and its defense of those regulations here largely rest on its belief that, with respect to edge providers,

broadband providers are not "carriers" at all. Stating that an entity is not a common carrier if it may decide on an individualized basis "'whether and on what terms to deal' with potential *customers*," the Commission asserted in the *Order* that "[t]he customers at issue here are the end users who subscribe to broadband Internet access services." *Open Internet Order*, 25 F.C.C.R. at 17950–51 ¶ 79 (quoting *NARUC I*, 525 F.2d at 641) (emphasis added). It explained that because broadband providers would remain able to make "individualized decisions" in determining on what terms to deal with end users, the *Order* permitted the providers the "flexibility to customize service arrangements for a particular customer [that] is the hallmark of private carriage." *Id.* at 17951 ¶ 79. Here, the Commission reiterates that "as long as [a broadband provider] is not required to serve end users indiscriminately, rules regarding blocking or charging edge providers do not create common carriage." Commission's Br. 61. We disagree.

It is true, generally speaking, that the "customers" of broadband providers are end users. But that hardly means that broadband providers could not also be carriers with respect to edge providers. "Since it is clearly possible for a given entity to carry on many types of activities, it is at least logical to conclude that one may be a common carrier with regard to some activities but not others." *NARUC II*, 533 F.2d at 608. Because broadband providers furnish a service to edge providers, thus undoubtedly functioning as edge providers' "carriers," the obligations that the Commission imposes on broadband providers may well constitute common carriage *per se* regardless of whether edge providers are broadband providers' principal customers. This is true whatever the nature of the preexisting commercial relationship between broadband providers and edge providers. In contending otherwise, the Commission appears to misunderstand the nature of the inquiry

in which we must engage. The question is not whether, absent the *Open Internet Order*, broadband providers would or did act as common carriers with respect to edge providers; rather, the question is whether, given the rules imposed by the *Open Internet Order*, broadband providers are *now* obligated to act as common carriers. *See Midwest Video II*, 440 U.S. at 701–02.

In support of its understanding of common carriage, the Commission first invokes section 201(a), which provides that it is the "duty of every common carrier . . . to furnish . . . communication service upon reasonable request therefor." 47 U.S.C. § 201(a). No one disputes that a broadband provider's transmission of edge-provider traffic to its end-user subscribers represents a valuable service: an edge provider like Amazon wants and needs a broadband provider like Comcast to permit its subscribers to use Amazon.com. According to the Commission, however, because edge providers generally do not "request" service from broadband providers, and may have no direct relationship with end users' local access providers, broadband providers cannot be common carriers with respect to such edge providers. But section 201(a) describes a "duty" of a common carrier, not a prerequisite for qualifying as a common carrier in the first place. More important, the *Open Internet Order* imposes this very duty on broadband providers: given the *Open Internet Order*'s anti-blocking and anti-discrimination requirements, *if* Amazon were now to make a request for service, Comcast *must* comply. That is, Comcast must now "furnish . . . communication service upon reasonable request therefor." 47 U.S.C. § 201(a).

Similarly flawed is the Commission's argument that because the Communications Act defines a "common carrier" as a "common carrier *for hire*," 47 U.S.C. § 153(11) (emphasis added), a common carrier relationship may exist only with respect to those customers who purchase service from the

carrier. As Verizon aptly puts it in response, the fact that "broadband providers . . . generally have not charged edge providers for access or offered them differentiated services . . . has no legal significance because the avowed purpose of the rules is to deny providers the discretion to do so now and in the future." Verizon's Reply Br. 5 n.3. In other words, but for the *Open Internet Order*, broadband providers could freely impose conditions on the nature and quality of the service they furnish edge providers, potentially turning certain edge providers—currently able to "hire" their service for free—into paying customers. The Commission may not claim that the *Open Internet Order* imposes no common carrier obligations simply because it compels an entity to continue furnishing service at no cost.

Likewise, the Commission misses the point when it contends that because the Communications Act "imposes non-discrimination requirements on many entities that are not common carriers," the *Order*'s requirements cannot "transform[] providers into common carriers." Commission's Br. 66–67. In support, the Commission cites 47 U.S.C. § 315(b), which requires that broadcasters charge political candidates nondiscriminatory rates if broadcasters permit them to use their stations, as well as 47 U.S.C. § 548(c)(2)(B), which prohibits satellite programming vendors owned in part or in whole by a cable operator from discriminating against other cable operators in the delivery of programming. Commission's Br. 66–67. But Congress has no statutory obligation to avoid imposing common carrier obligations on those who might not otherwise operate as common carriers, and thus the extent to which the cited provisions might regulate those entities as such is irrelevant. The Commission, on the other hand, has such an obligation with respect to entities it has classified as statutorily exempt from common carrier treatment, and the issue here is whether it has nonetheless "relegated [those entities], *pro*

*tanto*, to common-carrier status." *Midwest Video II*, 440 U.S. at 700–01.

In these respects, *Midwest Video II* is indistinguishable. The *Midwest Video II* cable operators' primary "customers" were their subscribers, who paid to have programming delivered to them in their homes. There, as here, the Commission's regulations required the regulated entities to carry the content of third parties to these customers—content the entities otherwise could have blocked at their discretion. Moreover, much like the rules at issue here, the *Midwest Video II* regulations compelled the operators to hold open certain channels for use at no cost—thus permitting specified programmers to "hire" the cable operators' services for free. Given that the cable operators in *Midwest Video II* were carriers with respect to these third-party programmers, we see no basis for concluding that broadband providers are not similarly carriers with respect to third-party edge providers.

The Commission advances several grounds for distinguishing *Midwest Video II*. None is convincing.

The Commission asserts that, unlike in *Midwest Video II*, here the content is delivered to end users only when an end user requests it—i.e., by clicking on a link to an edge provider's website. But the same was essentially true in *Midwest Video II*: cable companies' customers would not actually receive the content on the dedicated public access channels unless they chose to watch those channels. The access requested by the programmers in *Midwest Video II*, like the access requested by edge providers here, is the ability to have their communications transmitted to end-user subscribers if those subscribers so desire.

Nor, contrary to the Commission's contention, is it at all relevant that in *Midwest Video II* only a limited number of cable channels were available, while in this case the number of edge providers a broadband provider could serve is unlimited. Whether an entity qualifies as a carrier does not turn on how much content it is able to carry or the extent to which other content might be crowded out. A short train is no more a carrier than a long train, or even a train long enough to serve every possible customer.

Finally, *Midwest Video II* cannot be distinguished on the basis that the Court there emphasized the degree to which the Commission's rules impinged on cable operators' "editorial discretion," and "transferred control" over the content transmitted. Commission's Br. 65. The Court made two related points regarding editorial discretion, neither of which helps the Commission. First, it observed that the need to protect editorial discretion was one reason Congress forbade common carrier treatment of broadcasters in the first place, a rationale that also applied to cable operators, thus confirming the Court's decision to extend that statutory prohibition to the Commission's attempt to exercise its ancillary jurisdiction over such entities. *Midwest Video II*, 440 U.S. at 700, 706–08. Here, whatever might be the *justifications* for prohibiting common carrier treatment of "information service" providers and "commercial" mobile service providers, such treatment is undoubtedly prohibited. *See* 47 U.S.C. §§ 153(51), 332(c)(2). Second, the Court emphasized that, unlike the regulations approved in *United States v. Midwest Video Corp.*, 406 U.S. 649 (1972) ("*Midwest Video I*")—which required certain cable companies to create their own programming and maintain facilities for local production, *id.* at 653–55—the regulations in *Midwest Video II* "transferred control of the content of access cable channels from cable operators to members of the public." *Midwest Video II*, 440 U.S. at 700. The Court's point was

simply that the *Midwest Video I* regulations had created no common carrier obligations because they had imposed no obligation on cable operators to provide carriage to any third party. By giving third parties "control" over the transmissions that cable operators carried, however, the *Midwest Video II* regulations did. The regulations here accomplish the very same sort of transfer of control: whereas previously broadband providers could have blocked or discriminated against the content of certain edge providers, they must now carry the content those edge providers desire to transmit. The only remaining question, then, is whether the *Open Internet Order*'s rules have so limited broadband providers' control over edge providers' transmissions that the regulations constitute common carriage *per se*. It is to that question that we now turn.

## C.

We have little hesitation in concluding that the anti-discrimination obligation imposed on fixed broadband providers has "relegated [those providers], *pro tanto*, to common carrier status." *Midwest Video II*, 440 U.S. at 700–01. In requiring broadband providers to serve all edge providers without "unreasonable discrimination," this rule by its very terms compels those providers to hold themselves out "to serve the public indiscriminately." *NARUC I*, 525 F.2d at 642.

Having relied almost entirely on the flawed argument that broadband providers are not carriers with respect to edge providers, the Commission offers little response on this point. In its briefs, the Commission contends only that if the *Open Internet Order* imposes common carriage requirements, so too would the regulations at issue in *United States v. Southwestern Cable Co.*, 392 U.S. 157 (1968), which the Supreme Court declined to strike down. *Southwestern Cable* involved a Commission rule that, among other things, compelled cable operators to transmit the signals of local broadcasters when

cable operators imported the competing signals of other broadcasters into the local service area. *Id.* at 161. Such a rule is plainly distinguishable from the *Open Internet Order*'s anti-discrimination rule because the *Southwestern Cable* regulation imposed no obligation on cable operators to hold their facilities open to the public generally, but only to certain specific broadcasters if and when the cable operators acted in ways that might harm those broadcasters. As the Court later explained in *Midwest Video II*, the *Southwestern Cable* rule "was limited to remedying a specific perceived evil," and "did not amount to a duty to hold out facilities indifferently for public use." 440 U.S. at 706 n.16. The *Open Internet Order*'s anti-discrimination provision is not so limited, as the compelled carriage obligation applies in all circumstances and with respect to all edge providers.

Significantly for our purposes, the Commission never argues that the *Open Internet Order*'s "no unreasonable discrimination" standard somehow differs from the nondiscrimination standard applied to common carriers generally—the argument that salvaged the data roaming requirements in *Cellco*. In a footnote in the *Order* itself, the Commission suggested that it viewed the rule's allowance for "reasonable network management" as establishing treatment that was somehow inconsistent with *per se* common carriage. *See Open Internet Order*, 25 F.C.C.R. at 17951 ¶ 79 n.251. But the Commission has forfeited this argument by failing to raise it in its briefs here. *See Comcast*, 600 F.3d at 660; *Roth v. U.S. DOJ*, 642 F.3d 1161, 1181 (D.C. Cir. 2011).

In any event, the argument is without merit. The *Order* defines the "reasonable network management" concept as follows: "A network management practice is reasonable if it is appropriate and tailored to achieving a legitimate network management purpose, taking into account the particular

network architecture and technology of the broadband Internet access service." *Open Internet Order*, 25 F.C.C.R. at 17952 ¶ 82. This provision, the Commission explained, would permit broadband providers to do two things, neither of which conflict with *per se* common carriage. First, "the reasonable network management" exception would permit broadband providers to "address[] traffic that is unwanted by end users . . . such as by providing services or capabilities consistent with an end user's choices regarding parental controls or security capabilities." *Id.* Because the relevant service broadband providers furnish to edge providers is the ability to access end users if those end users so desire, a limited exception permitting *end users* to direct broadband providers to block certain traffic by no means detracts from the common carrier nature of the obligations imposed on broadband providers. Second, the *Order* defines "reasonable network management" to include practices designed to protect the network itself by "addressing traffic that is harmful to the network" and "reducing or mitigating the effects of congestion." *Id.* at 17952 ¶ 82. As Verizon correctly points out, however, this allowance "merely preserves a common carrier's traditional right to 'turn[] away [business] either because it is not of the type normally accepted or because the carrier's capacity has been exhausted.'" Verizon's Br. 20 (quoting *NARUC I*, 525 F.2d at 641). Railroads have no obligation to allow passengers to carry bombs on board, nor need they permit passengers to stand in the aisles if all seats are taken. It is for this reason that the Communications Act bars common carriers from engaging in "*unjust or unreasonable* discrimination," not *all* discrimination. 47 U.S.C. § 202 (emphasis added).

The Commission has provided no basis for concluding that in permitting "reasonable" network management, and in prohibiting merely "unreasonable" discrimination, the *Order*'s standard of "reasonableness" might be more permissive than

the quintessential common carrier standard. *See Cellco*, 700 F.3d at 548 (characterizing the "just and reasonable" standard as being that "applicable to common carriers"). To the extent any ambiguity exists regarding how the Commission will apply these rules in practice, we think it is best characterized as ambiguity as to *how* the common carrier reasonableness standard applies in this context, not *whether* the standard applied is actually the same as the common carrier standard. Unlike the data roaming requirement at issue in *Cellco*, which set forth a "commercially reasonable" standard, *see id.* at 537, the language of the *Open Internet Order*'s anti-discrimination rule mirrors, almost precisely, section 202's language establishing the basic common carrier obligation not to "make any unjust or unreasonable discrimination." 47 U.S.C. § 202. Indeed, confirming that the two standards are equivalent, the Commission responded to commenters who argued that the "no unreasonable discrimination" requirement was too vague by quoting another commenter who observed that "[s]eventy-five years of experience have shown [the 'unreasonable' qualifier in Section 202] to be both administrable and indispensable to the sound administration of the nation's telecommunications laws." *Open Internet Order*, 25 F.C.C.R. at 17949 ¶ 77 n.240. Moreover, unlike the data roaming rule in *Cellco*—which spelled out "sixteen different factors plus a catchall . . . that the Commission must take into account in evaluating whether a proffered roaming agreement is commercially reasonable," thus building into the standard "considerable flexibility," *Cellco*, 700 F.3d at 548—the *Open Internet Order* makes no attempt to ensure that its reasonableness standard remains flexible. Instead, with respect to broadband providers' potential negotiations with edge providers, the *Order* ominously declares: "it is unlikely that pay for priority would satisfy the 'no unreasonable discrimination' standard." *Open Internet Order*, 25 F.C.C.R. at 17947 ¶ 76. If the Commission will likely bar broadband

providers from charging edge providers for using their service, thus forcing them to sell this service to all who ask at a price of $0, we see no room at all for "individualized bargaining." *Cellco*, 700 F.3d at 548.

Whether the *Open Internet Order*'s anti-blocking rules, applicable to both fixed and mobile broadband providers, likewise establish *per se* common carrier obligations is somewhat less clear. According to Verizon, they do because they deny "broadband providers discretion in deciding which traffic from . . . edge providers to carry," and deny them "discretion over carriage terms by setting a uniform price of zero." Verizon's Br. 16–17. This argument has some appeal. The anti-blocking rules establish a minimum level of service that broadband providers must furnish to all edge providers: edge providers' "content, applications [and] services" must be "effectively []usable." *Open Internet Order*, 25 F.C.C.R. at 17943 ¶ 66. The *Order* also expressly prohibits broadband providers from charging edge providers any fees for this minimum level of service. *Id.* at 17943–44 ¶ 67. In requiring that all edge providers receive this minimum level of access for free, these rules would appear on their face to impose *per se* common carrier obligations with respect to that minimum level of service. *See Midwest Video II*, 440 U.S. at 701 n.9 (a carrier may "operate as a common carrier with respect to a portion of its service only").

At oral argument, however, Commission counsel asserted that "[i]t's not common carriage to simply have a basic level of required service if you can negotiate different levels with different people." Oral Arg. Tr. 86. This contention rests on the fact that under the anti-blocking rules broadband providers have no obligation to actually provide any edge provider with the minimum service necessary to satisfy the rules. If, for example, all edge providers' "content, applications [and]

services" are "effectively usable," *Open Internet Order*, 25 F.C.C.R. at 17943 ¶ 66, at download speeds of, say, three mbps, a broadband provider like Verizon could deliver all edge providers' traffic at speeds of at least four mbps. Viewed this way, the relevant "carriage" broadband providers furnish might be access to end users more generally, not the minimum required service. In delivering this service, so defined, the anti-blocking rules would permit broadband providers to distinguish somewhat among edge providers, just as Commission counsel contended at oral argument. For example, Verizon might, consistent with the anti-blocking rule—and again, absent the anti-discrimination rule—charge an edge provider like Netflix for high-speed, priority access while limiting all other edge providers to a more standard service. In theory, moreover, not only could Verizon negotiate separate agreements with each individual edge provider regarding the level of service provided, but it could also charge similarly-situated edge providers completely different prices for the same service. Thus, if the relevant service that broadband providers furnish is access to their subscribers generally, as opposed to access to their subscribers at the specific minimum speed necessary to satisfy the anti-blocking rules, then these rules, while perhaps establishing a lower limit on the forms that broadband providers' arrangements with edge providers could take, might nonetheless leave sufficient "room for individualized bargaining and discrimination in terms" so as not to run afoul of the statutory prohibitions on common carrier treatment. *Cellco*, 700 F.3d at 548.

Whatever the merits of this view, the Commission advanced nothing like it either in the underlying *Order* or in its briefs before this court. Instead, it makes no distinction at all between the anti-discrimination and anti-blocking rules, seeking to justify both types of rules with explanations that, as we have explained, are patently insufficient. We are unable to

sustain the Commission's action on a ground upon which the agency itself never relied. *Lacson v. Department of Homeland Security*, 726 F.3d 170, 177 (D.C. Cir. 2013); *see also United States v. Southerland*, 486 F.3d 1355, 1360 (D.C. Cir. 2007) ("argument[s] . . . raised for the first time at oral argument [are] forfeited"). Nor may we defer to a reading of a statutory term that the Commission never offered. *Shieldalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*, 624 F.3d 489, 495 (D.C. Cir. 2010).

The disclosure rules are another matter. Verizon does not contend that these rules, on their own, constitute *per se* common carrier obligations, nor do we see any way in which they would. Also, because Verizon does not direct its First Amendment or Takings Clause claims against the disclosure obligations, we have no need to address those contentions here.

Verizon does argue that the disclosure rules are not severable, insisting that if the anti-discrimination and anti-blocking rules fall so too must the disclosure requirements. We disagree. "Whether the offending portion of a regulation is severable depends upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis omitted). At oral argument, Commission counsel explained that the rules function separately, Oral Arg. Tr. 81–82, and we are satisfied that the Commission would have adopted the disclosure rules absent the rules we now vacate, which, we agree, operate independently. *See Davis County Solid Waste Management v. EPA*, 108 F.3d 1454, 1457–59 (D.C. Cir. 1997) (finding promulgated standard to be severable where EPA asserted in rehearing petition that, contrary to its position at oral argument, the standards could stand alone).

## IV.

For the forgoing reasons, although we reject Verizon's challenge to the *Open Internet Order*'s disclosure rules, we vacate both the anti-discrimination and the anti-blocking rules. *See Northern Air Cargo v. U.S. Postal Service*, 674 F.3d 852, 860–61 (D.C. Cir. 2012) (appropriateness of vacatur dependent on whether "(1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly"); *Comcast*, 600 F.3d at 661 (vacating the *Comcast Order*). We remand the case to the Commission for further proceedings consistent with this opinion.

*So ordered.*

SILBERMAN, *Senior Circuit Judge*, *concurring in part* and *dissenting in part*: I am in general agreement with the majority's conclusion that the *Open Internet Order* impermissibly subjects broadband providers to treatment as common carriers, but I disagree with the majority's conclusion that § 706 otherwise provides the FCC with affirmative statutory authority to promulgate these rules. I also think the Commission's reasoning violates the Administrative Procedure Act. These differences are important since the majority opinion suggests possible regulatory modifications that might circumvent the prohibition against common carrier treatment.

I.

The Commission's net neutrality regulation is purportedly designed to promote innovation among edge providers who, in turn, provide Internet user experience, thereby increasing user demand for broadband service and, ultimately, encouraging broadband providers to invest in infrastructure development to meet that demand. *Open Internet Order*, 25 F.C.C.R. 17905, 17907 ¶ 13 (2010). The petitioners describe this theory as a "triple cushion shot." As I will show, whatever its logic, it is based on a faulty factual premise. But my first disagreement with the Commission, and the majority, is to the claimed statutory authority.

I quite agree with the majority that the relevant statutory language is § 706 of the Communications Act. 47 U.S.C. § 1302. Although the FCC purports to rely on a scatter shot of other provisions of the statute, as well as § 706, none of those other provisions truly bear on the issue. "Emanations from the penumbra" may once have served to justify constitutional interpretation, but it hasn't caught on as legitimate statutory interpretation. I also agree with the majority – and disagree with petitioners – that § 706 is a grant of positive regulatory authority, but it doesn't come close to sanctioning the Commission's regulation.

The statute directs the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." 47 U.S.C. § 1302(a).[1]

The FCC contends for, and the majority grants, *Chevron* deference as to the interpretation of this language. I don't disagree that *Chevron* is called for, but *Chevron* "is not a wand by which courts can turn an unlawful frog into a legitimate prince." *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 1001 (D.C. Cir. 1987).

The key words obviously are "measures that promote competition in the local telecommunications market or other regulating methods that remove barriers to infrastructure investment." Those are the words that grant actual authority. Yet the Commission does not ground its regulation on this language. Indeed, both the Commission and the majority conflate these two clauses, though they have distinct functions. "Promoting competition in the telecommunications market" implies a regulation that encourages broadband providers to compete *with each other*, head-to-head, on price and quality. Removing "barriers to infrastructure investment," on the other hand, does not necessarily require any increased competition in the

---

[1] Because § 706(b) contains almost the same language, it is unnecessary to discuss these two provisions separately. *See* 47 U.S.C. § 1302(b) (The Commission "shall take immediate action . . . by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.").

telecommunications market.[2] For example, if a particular broadband provider were a monopolist, then by regulating its prices, the Commission might encourage it to expand supply to increase profits, rather than artificially restrict supply so as to charge supracompetitive rates. Such a regulation would not increase competition, but it would at least potentially remove a barrier to investment. This is, essentially, the theory that the Commission purportedly relies on: If the Commission theoretically could spur demand for broadband, the Commission would encourage further infrastructure investment regardless of head-to-head competition. Thus, it is on the "removing barriers" clause, primarily,[3] that the *Order* must stand or fall. Yet, the Commission never actually identifies any practices of the broadband providers as "barriers to investment" – not once in over 100 pages – probably because it would be so far fetched an interpretation of those words.

Nor does the Commission state (or argue in its brief), contrary to the majority's opinion, that the "triple cushion shot" – the means by which the Commission hopes to stimulate demand for better broadband – is designed to increase competition in the broadband market. *See* Majority Op. at 31-32 (citing 25 F.C.C.R. at 17910-11, 17970 ¶¶ 14, 120). Paragraph

---

[2]    An example of a paradigmatic barrier to infrastructure investment would be state laws that prohibit municipalities from creating their own broadband infrastructure to compete against private companies. *See* Klint Finley, *Why Your City Should Compete With Google's Super-Speed Internet*, WIRED, May 28, 2013, http://www.wired.com/wiredenterprise/2013/05/community-fiber/.

[3]    The transparency rules at least have the added benefit of facilitating consumer choice by providing information, which could lead to greater competition in the broadband market.

14 makes no reference to competition,[4] and paragraph 120 does not refer to competition between broadband providers in the *local telecommunications* market – which is the statutory objective. Indeed, paragraph 120 indicates that the Commission's objective is to protect the edge providers (not in

[4] The Internet's openness is critical to these outcomes, because it enables a virtuous circle of innovation in which new uses of the network – including new content, applications, services, and devices – lead to increased end-user demand for broadband, which drives network improvements, which in turn lead to further innovative network uses. Novel, improved, or lower-cost offerings introduced by content, application, service, and device providers spur end-user demand and encourage broadband providers to expand their networks and invest in new broadband technologies. Streaming video and e-commerce applications, for instance, have led to major network improvements such as fiber to the premises, VDSL, and DOCSIS 3.0. These network improvements generate new opportunities for edge providers, spurring them to innovate further. Each round of innovation increases the value of the Internet for broadband providers, edge providers, online businesses, and consumers. Continued operation of this virtuous circle, however, depends upon low barriers to innovation and entry by edge providers, which drive end-user demand. Restricting edge providers' ability to reach end users, and limiting end users' ability to choose which edge providers to patronize, would reduce the rate of innovation at the edge and, in turn, the likely rate of improvements to network infrastructure. Similarly, restricting the ability of broadband providers to put the network to innovative uses may reduce the rate of improvements to network infrastructure.

25 F.C.C.R. at 17910-11 ¶ 14.

the telecommunications market) from content competition with the broadband providers.**⁵**

Indeed, the Commission frankly admits its purpose is much wider than the statutory objectives. It claims it must regulate broadly, so as to "protect[] consumer choice, free expression, end-user control, and the ability to innovate without permission," 25 F.C.C.R. at 17949 ¶ 78, which certainly

---

⁵       In directing the Commission to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans . . . by utilizing . . . price cap regulation, regulatory forbearance, measures that promote competition in the *local telecommunications market*, or other regulating methods that remove barriers to infrastructure investment," Congress necessarily invested the Commission with the statutory authority to carry out those acts. Indeed, the relevant Senate Report explained that the provisions of Section 706 are "intended to ensure that one of the primary objectives of the [1996 Act] – to accelerate deployment of advanced telecommunications capability – is achieved," and stressed that these provisions are "a necessary fail-safe" to guarantee that Congress's objective is reached. It would be odd indeed to characterize Section 706(a) as a "fail-safe" that "ensures" the Commission's ability to promote advanced services if it conferred no actual authority. Here, under our reading, Section 706(a) authorizes the Commission to address practices, such as blocking VoIP communications, degrading or raising the cost of online video, or denying end users material information about their broadband service, that have the potential to stifle overall investment in Internet infrastructure and limit competition in telecommunications markets.

25 F.C.C.R. at 17970 ¶ 120 (emphasis added)**.**

indicates a Commission objective that exceeds the statutory authority granted in § 706.

The majority takes the statutory language even further; it states that the Commission's

> authority to promulgate regulations that promote broadband deployment encompasses the power to regulate broadband providers' economic relationships with edge providers if, in fact, the nature of those relationships influences the rate and extent to which broadband providers develop and expand services for end users.

Majority Op. at 33. So much for the terms "promote competition in the local telecommunications market" or "remove barriers to infrastructure investment." Presto, we have a new statute granting the FCC virtually unlimited power to regulate the Internet. This reading of § 706, as we said in *Comcast Corp. v. FCC*, "would virtually free the Commission from its congressional tether." 600 F.3d 642, 655 (D.C. Cir. 2010). The limiting principles the majority relies on are illusory.

The majority claims that the Commission cannot exceed its subject-matter jurisdiction over "interstate and foreign communication by wire and radio." 25 F.C.C.R. at 17970 ¶ 121 (citing 47 U.S.C. § 152(a)). This is obviously true, but it is not a limitation on the Commission's interpretation of this specific statutory provision. The question is not whether the statute permits the Commission to do absolutely anything – of course it does not – but, rather, whether § 706 contains any *intrinsic* limitations. If the Commission's subject matter jurisdiction is a "limiting principle," then we might as well call the First Amendment a limiting principle, for surely the Commission could not censor the Internet, even if doing so did somehow increase broadband deployment.

According to the majority, the Commission is also restrained because it may only regulate pursuant to § 706 if it does so to achieve a particular purpose: to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans." 25 F.C.C.R. at 17970 ¶ 121 (citing 47 U.S.C. § 1302(a)). This is an almost meaningless limitation, as demonstrated by the *Open Internet Order* itself. The Commission's theory is that an open Internet will spur demand for broadband infrastructure. *Id*. at 17907 ¶ 3. But any regulation that, in the FCC's judgment might arguably make the Internet "better," could increase demand. I do not see how this "limitation" prevents § 706 from being carte blanche to issue any regulation that the Commission might believe to be in the public interest.

To sum up, § 706 requires the Commission to identify a "barrier[] to infrastructure investment" or a measure that "promote[s] competition" in the *broadband* market – which it has not.

## II.

Petitioners alternatively argue that, even assuming that § 706 grants the Commission its claimed authority, the regulation is arbitrary and capricious because its findings – such as they are – lack substantial evidence. I agree. Although we are not faced with a formal adjudication which would be judged by substantial evidence on a closed record, factual determinations that underly regulations must still be premised on demonstrated – and reasonable – evidential support. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Commission purports to fear that broadband providers might discriminate against, or even block, the Internet traffic of specific edge providers or classes of edge providers, perhaps

because broadband providers offer some competing services or because they might charge certain edge providers for premium services. The majority puts it even more starkly, asserting that the Commission "found that broadband providers have the technical and *economic* ability to impose restrictions on edge providers." Majority Op. at 38 (emphasis added). But the Commission never actually made such a finding. Its conclusions are littered with "may," "if," and "might." For example, according to the Commission, a broadband provider:

- "may have economic incentives to block or otherwise disadvantage specific edge providers"

- "might use this power to benefit its own or affiliated offerings at the expense of unaffiliated offerings"

- "may act to benefit edge providers that have paid it to exclude rivals"

- "may have incentives to increase revenues by charging edge providers"[6]

- "might withhold or decline to expand capacity in order to 'squeeze' non-prioritized traffic"

25 F.C.C.R. at 17915-22 ¶¶ 21-29. To be sure, the majority correctly observes that we should defer to an agency's "predictive judgments as to the economic effect of a rule," *National Telephone Cooperative Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009), but deference to such a judgment must be based on some logic and evidence, not sheer speculation. That

---

[6]  In this case, Verizon has indicated it does wish to explore two-sided pricing (charging both edge providers and consumers).

a party "may" do something is hardly a finding – at least in American law – that a party has done or will do something. Moreover, whether or not the "triple cushion shot" theory is rational economics (and I have my doubts), it rests, as I have noted, on a false factual premise – that the evidence supports a finding that broadband providers across the board, in all markets, enjoy sufficient economic clout to take the above actions.

The Commission asserts – and the majority accepts – that broadband providers act as "gatekeepers" because each one has a so-called "terminating monopoly" over access to particular end users. These are terms, largely invented,[7] the economic significance of which the Commission does not explain. All

---

[7]    My research has not revealed any use of the phrase "terminating monopoly" outside of the context of these proceedings before the FCC. It does not appear to be an accepted economic term. A "gatekeeper," on the other hand, is an intermediary between a consumer and an upstream seller. And a consumer's willingness to switch to another available supplier depends on the prospective benefit measured against the transaction costs (how many blocks am I willing to walk, or how many phone calls am I willing to make?).

Recent literature suggests that gatekeepers may sometimes exercise market power against upstream suppliers even when the gatekeeper does not have enough market share to exercise downstream market power against consumers. *See, e.g.,* Grimes, Warren S., *Buyer Power and Retail Gatekeeper Power: Protecting Competition and the Atomistic Seller*, 72 ANTITRUST L. J. 563, 580 (2005). One example would be if I purchase my groceries at a particular store, any food supplier who wishes to sell to me probably must do so through that particular store because I am unlikely to switch grocery stores over a single product. Regardless of any contemporary debates over the differences between buyer power and seller power, one thing is clear: The gatekeeper effect is a tool that facilitates the exercise of market power over sellers; it is not market power itself.

retail stores, for instance, are "gatekeepers." The term is thus meaningful only insofar as the gatekeeper by means of a powerful economic position vis-a-vis consumers gains leverage over suppliers.[8] The Commission made no effort to construct an analytic framework to measure this supposed gateway advantage – it is a rather slippery concept – nor did it adduce evidence to establish the economic power it would supposedly afford all broadband providers against all edge providers.

Without broadband provider market power, consumers, of course, have options; they can go to another broadband provider if they want to reach particular edge providers or if their connections to particular edge providers have been degraded. The Commission implicitly recognizes this, because it justifies exempting dial-up Internet providers from the *Order* by noting that "telephone service has historically provided the easy ability to switch among competing dial-up Internet access services." 25 F.C.C.R. at 17935 ¶ 51. The Commission also exempts "backbone" Internet providers – which interconnect between broadband providers – obviously for the same reason. On the other hand, the Commission asserts that broadband customers may have few alternatives or they may be locked into long-term

---

[8]     The Commission treats each individual edge provider as analogous to an upstream seller in a retail context. But it seems more plausible that consumers consider "Internet access" to be the product that they are buying, and that large product creates greater incentives to switch to another provider. Although the Commission has argued that consumers will perceive a slow connection to a particular edge provider as indicative of a problem with that edge provider, rather than as a problem with the quality of Internet access provided by the broadband provider, 25 F.C.C.R. at 17921 ¶ 27, the Commission presents no evidence to support that conclusion. Indeed, edge providers have a strong incentive to inform consumers if their connections are being degraded. Moreover, the transparency rule, which we uphold, makes this outcome almost impossible.

contracts with early-termination fees. To be sure, some difficulty switching broadband providers is certainly a factor that might contribute to a firm's having market power, but that itself is not market power. There are many industries in which switching between competitors is not instantly achieved, but those industries may still be heavily disciplined by competitive forces because consumers will switch unless there are real barriers. By pointing to potential difficulties consumers may encounter switching broadband providers, the Commission is simply implying that broadband providers have market power (market power lite?), without actually examining if and where they do.

Although petitioners were reluctant to concede that even if a broadband provider had market power that would authorize the Commission to take action under § 706 – presumably because they challenged any regulatory authority under § 706 – they did bring to our attention a Justice Department submission, discussed *infra,* that emphasized the necessity of the Commission limiting its regulatory initiatives to the control of broadband market power. *Ex Parte* Submission of the U.S. DOJ at 28, Docket No. 09-51 (Jan. 4, 2010). My discussion of market power reflects my view (and apparently the Justice Department's) of what evidence would be adequate to support the Commission's rule. In any event, petitioner certainly challenged the factual basis of the Commission's "gateway" conclusion, so I don't think the existence *vel non* of market power is really a different consideration. *See* Majority Op. at 40-41.

The majority does contend that four possible instances of broadband providers restricting users' access to certain edge providers are sufficient evidence of broadband providers' "incentives and ability to restrict Internet traffic." Majority Op. at 43. That the Commission was able to locate only four potential examples of such conduct is, frankly, astonishing. In such a large industry where, as Verizon notes, billions of

connections are formed between users and edge providers each year, one would think there should be ample examples of just about any type of conduct. But even if examples of such conduct were more numerous, it would still not be evidence that broadband providers are economically capable of restricting consumer choice. And, as the Commission noted, there are potentially efficient, pro-consumer reasons that an individual broadband provider might wish to restrict access to some edge providers. *See* 25 F.C.C.R. at 17921 ¶ 28 n.80 ("Economics literature recognizes that access charges could be harmful under some circumstances and beneficial under others. . . . [T]he economic literature on two-sided markets is at an early stage of development."). The Commission's anecdotes then do not show that any broadband providers are capable of actually causing the harm about which the Commission is concerned.

My view, then, is that the Commission's failure to conduct a market power analysis is fatal to its attempt to regulate, because it means that there is inadequate evidence to support the lynchpin of the Commission's economic theory. The Commission actually recognized that a finding of market power would enhance its theory. 25 F.C.C.R. at 17923 ¶ 32. Indeed! But such a finding would, of course, have to be made market to market (indeed the statute specifically references *local* telecommunications markets), and if so, it would be a finding of a barrier to broadband investment without the mental gymnastics of the triple cushion shot. If one (or two) broadband providers have market power in any particular market and thereby could raise prices while restricting supply, the Commission could well conclude that was a barrier to broadband investment.

Of course, before the Commission could determine whether a particular broadband provider possesses market power, it would have to first define the relevant market. Instead, the Commission, in this case, simply cited a 2009 study that found that "nearly 70 percent of households lived in census tracts

where only one or two wireline or fixed wireless firms provided advertised download speeds of at least 3 Mbps and upload speeds of at least 768 Kbps." 25 F.C.C.R. at 17923 ¶ 32. Why are these speeds relevant? Because the Commission has previously, as part of its statutory duty to assess the state of broadband deployment, defined "broadband" to mean download speeds of at least 4 Mbps and upload speeds of at least 1 Mbps. *Sixth Broadband Deployment Report*, 25 F.C.C.R. 9556, 9559 ¶ 5 (2010). According to the Commission, it is the minimum speed necessary to stream high quality video while simultaneously browsing the Internet and using email. *Id.* I don't dispute the legitimacy of that definition. Yet, while the Commission is free to rely on technical considerations in defining the statutory term "broadband," such considerations are irrelevant when it comes to defining the market in economic terms. A broadband provider offering a 2 Mbps connection is not, according to the FCC, really offering broadband. But it is quite likely that consumers, in deciding which Internet service to purchase, will compare products at varying speeds and price points. Slower service providers can still exert competitive pressure on faster service providers. So, too, can mobile broadband providers. Before the Commission can conclude that a market is concentrated, it must first define that market. It has made no effort to do so.

The Commission, moreover, does not address whether the trend in the broadband market is towards more or less competition. Obviously the deployment of broadband infrastructure is a capital-intensive process, and it should not be surprising if, during a period of expansion, some areas are served by fewer competitors than others. But there is no evidence in the record suggesting that broadband providers are carving up territory or avoiding head-to-head competition. At least anecdotally, the opposite seems to be true. Google has now entered the broadband market as a direct competitor:

> Google's ultra-high-speed Internet service may finally be scaring the big Internet providers into action. Following Google's announcement that it will expand into Austin, Texas, AT&T announced it will offer fiber Internet in the city, and Time Warner Cable announced it would offer citywide wireless Internet service.
>
> But smaller companies are also trying to head off Google before the company even makes an announcement in their communities. This week, for example, the Lawrence, Kansas-based Internet provider Wicked Broadband began taking pre-orders for a residential fiber Internet service with speeds to rival Google Fiber's.

Klint Finley, *Google Fiber Spurs Mom-and-Pop Net Providers Too*, WIRED, Apr. 26, 2013, http://www.wired.com/wiredenterprise/2013/04/google-fiber-wicked/.

The Commission apparently wanted to avoid a disciplined inquiry focused on market power, notwithstanding the warning it received from the Justice Department less than a year before the regulation issued – which, as I noted, the petitioner cited – a warning that unless the FCC's focus was on market power, any regulation could actually *discourage* broadband development, thus frustrating the statutory objective:

> Although enacting some form of regulation to prevent certain providers from exercising monopoly power may be tempting with regard to . . . areas [served by only one or two broadband providers], care must be taken to avoid stifling the infrastructure investments needed to expand broadband access. In particular, price regulation would be appropriate only where necessary to protect consumers from the exercise of monopoly

power and where such regulation would not stifle incentives to invest in infrastructure deployment.

*Ex Parte* Submission of the U.S. DOJ at 28, Docket No. 09-51 (Jan. 4, 2010).

The Commission did postulate one other economic theory supposedly establishing a "barrier to infrastructure investment" that does not depend on the broadband providers possessing market power. It argued, essentially, that innovation among edge providers is a public good in that every broadband provider benefits from an open Internet, but each broadband provider has an individual incentive to charge edge providers for service because, if broadband providers were to forego that revenue stream, they would be unable to internalize all of the supposed benefits to innovation. 25 F.C.C.R. at 17919 ¶ 25. In short, the Commission speculates that the *Open Internet Order* prevents a classic "tragedy of the commons"– a situation in which each economic actor, behaving in his own self-interest, contributes to the destruction of a public good. *See* Garrett Hardin, *The Tragedy of the Commons*, 162 SCIENCE 1243 (1968). In such a situation, each actor would be better off if a central regulator prevented them from doing what would be in their private interest if they were acting unilaterally. Again, however, the Commission fails to make any real economic findings regarding whether these rules are actually necessary to prevent such a situation. As such, it is the sheerest of fanciful speculation.

Indeed, if a tragedy of the commons were likely in the broadband market, then one would expect Verizon and other broadband providers to support the *Open Internet Order*, because such a situation would be economically harmful to them in the long run. By the same token, when firms oppose, on antitrust grounds, the merger of competing firms, it is generally a reliable indicator that the merger is pro-competitive. *See* Frank H. Easterbrook, *The Limits of Antitrust*, 63 TEX. L. REV. 1, 18

(1984) ("When a business rival brings suit, it is often safe to infer that the arrangement is beneficial to consumers."). Firms can generally be relied upon to know their own best interest.

Perhaps most troubling, the Commission fails to appreciate the long-term impact of its own regulations. An unwarranted government interference in a functioning market is likely to persist indefinitely, whereas a failure to intervene, even when regulation would be helpful, is likely to be only temporarily harmful because new innovations are constantly undermining entrenched industrial powers. *See id.* at 3 ("[J]udicial errors that tolerate baleful practices are self-correcting while erroneous condemnations are not."); Tim Wu, THE MASTER SWITCH 11 (2010) ("But as we have said, that which is centralized also eventually becomes a target for assault[.]").

Nevertheless, the Commission justifies its aggressive, prophylactic regulation by asserting that the negative consequences of regulation (preserving the status quo) are likely to be minor, while the consequences of allowing the broadband market to evolve without regulation could be drastic and permanent. 25 F.C.C.R. at 17909 ¶ 12. I think this is quite wrong, but in any event, the agency's judgment about the propriety of leaping before looking cannot displace the judgment of Congress which, in enacting § 706, did not so broadly empower the Commission. Rather, Congress required the agency to identify an actual barrier to infrastructure investment or a threat to competition, and the agency must have evidence that the barrier or threat exists.

### III.

Because the *Open Internet Order* obviously imposes common carrier obligations on broadband providers, I join generally the opinion of the Court with respect to Part III. Indeed, even noted proponents of "net neutrality" acknowledge

as much: "[N]et neutrality is the twenty-first century's version of common carriage. . . . In the case of the Internet, common carriage under the name of net neutrality amounts to an FCC rule that bans any degree of blocking individual sites, [or] transmission of data." Tim Wu, THE MASTER SWITCH 236 (2010).

I have, however, one quibble with the majority's analysis of the anti-blocking rules. Although ultimately concluding that the anti-blocking rules are unlawful, the majority says that whether those rules "likewise establish *per se* common carrier obligations is somewhat less clear." Majority Op. at 60. Although the *Order* states that, under the anti-blocking rules, broadband providers may not degrade content so as to make it "effectively unusable," the majority supposes that a broadband provider might voluntarily choose to offer service that is faster than the anti-blocking rules require, i.e., faster than the minimum speed necessary to make each edge provider effectively usable by consumers. By exceeding the minimum level of service, the majority suggests, the broadband providers would have wide latitude to engage in individualized bargaining, which might take this rule outside of common carriage *per se*. My concern with this hypothesis is that the phrase "effectively unusable" is subject to manipulation. I think it should mean that whatever speed is generally offered to most edge providers is the minimum necessary to be effectively usable. After all, it is artificial to distinguish between what is "effective" and what consumers expect. If a faster speed were to become standard, we would likely consider a slower speed to be effectively unusable. Thus, while there is a possibility that a "fast lane" Internet service might be offered on a non-common carriage basis, the service that most users receive under this rule would still have to be offered as common carriage, at a regulated price of zero. In any event, as the majority recognizes, the Commission did not

make this argument, so the anti-blocking rules must fall.[9]

\* \* \*

This regulation essentially provides an economic preference to a politically powerful constituency, a constituency that, as is true of typical rent seekers, wishes protection against market forces. The Commission does not have authority to grant such a favor.

---

[9] I do think that the transparency rules rest on firmer ground. The Commission is required to make triennial reports to Congress on "market entry barriers" in information services, 47 U.S.C. § 257, and requiring disclosure of network management practices appears to be reasonably ancillary to that duty. I also agree with the majority's conclusion that the disclosure rules are severable from the anti-discrimination and anti-blocking rules.